**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

## MOTION INFORMATION STATEMENT

**Docket Number(s):** 10-521; SDNY 05 cr 621 RJS                         Caption [use short title]

**Motion for:** Stay bail revocation; grant bail; remove RJS    US v VIlar and Tanaka

Set forth below precise, complete statement of relief sought:

Judge Sullivan just now revoked bail and ordered

defendants to surrender tomorrow at 10 am; the

court should stay the revocation, grant bail, and

for reasons in disqualificaiton motion, remove the jug

**MOVING PARTY:** Alberto Vilar and Gary Tanaka    **OPPOSING PARTY:** US Attorney SDNY

☐ Plaintiff          ☐ Defendant
☑ Appellant/Petitioner    ☐ Appellee/Respondent

**MOVING ATTORNEY:** Vivian Shevitz    **OPPOSING ATTORNEY:** Ben Naftalis

[name of attorney, with firm, address, phone number and e-mail]:

46 Truesdale Lake Drive    US Attorney SDNY
South Salem NY 10590
914 763 2122

Court-Judge/Agency appealed from: Sullivan J SDNY

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain):_____

Opposing counsel's position on motion:
☐ Unopposed ☐ Opposed ☑ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

Is oral argument on motion requested? ☑ Yes ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☐ No  If yes, enter date: Decision 8-31-13 - petitions for rehearing pending

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below? ☑ Yes ☐ No
Has this relief been previously sought in this Court? ☑ Yes ☑ No
Requested return date and explanation of emergency: Judge SUllivan

revoked bail and ordered defendants to surrender

tomorrow morning

**Signature of Moving Attorney:**
/s/ Vivian Shevitz    **Date:** 11/19/13    Service by: ☑ CM/ECF    ☐ Other [Attach proof of service]

---

## ORDER

**IT IS HEREBY ORDERED THAT** the motion is **GRANTED DENIED**.

                    **FOR THE COURT:**
                    CATHERINE O'HAGAN WOLFE, Clerk of Court

Date: _____    By: _____

**Form T-1080** (rev. 7-12)

| United States Court of Appeals | 10-521 |
| For the Second Circuit | SDNY 05 cr 621 (RJS) |

| UNITED STATES | DECLARATION Supporting Stay of Revocation of Bail, An order granting bail, And Removal of Judge Richard J. Sullivan |
| Against | District court 05 cr 621 Second Cir. 10-521 |
| ALBERTO VILAR and Gary Tanaka | |

Vivian Shevitz, under penalty of perjury, hereby declares:

1.  I am CJA counsel to Alberto Vilar and pro bono counsel to Gary Tanaka in this Court.

2.  This motion seeks an immediate and emergency stay of the Order of Judge Richard Sullivan today, revoking bail as to both defendants and ordering them to surrender to the US Marshalls *tomorrow*.

3. I attach Judge Sullivan's Order issued just now, November 19, 2013, revoking bail pending appeal/resentencing of Alberto Vilar and Gary Tanaka.  It is DOC 633 filed 1-19 13 in the criminal case, 05 cr 621.

4. I have not even had time to *read it* except briefly.  It is attached as Exhibit A.

5. Judge Sullivan issued this Order though we filed a motion to disqualify him because of demonstrated partiality.  Judge Sullivan denied the disqualification motion today, though only on Sunday night (a day ago), we filed the attached *reply* in connection with

that motion for disqualification, which he could not have time to have read thoroughly.

6. This Court should read it.  I attach the Reply on the motion to disqualify as Exhibit B.

7. This Court disqualified Shira Scheindlin for "using" the related case rule procedurally wrongly.  After we read that we reviewed just how the two "civil" cases (the SEC case and a turnover case) happened to get to Judge Sullivan.  He transferred them in knowing violation of Rule 13(b) *and* on the ground that he had the criminal case.

8. He did so after the US Attorney wrote him a secret letter not filed on the docket and not given to the defendants, telling him that though civil and criminal cases are not relatable under SDNY Rule 13(b), he should do it anyway.  He did.

9. That letter is attached to our reply papers on the motion to disqualify Judge Richard J. Sullivan.  This revocation of bail – quickly, and with no time to get to the Court of Appeals – is a continuation of the demonstrated bias and vindictiveness shown in our reply on disqualification, which Judge Sullivan could not have read or reflected on before denying bail.

10. This Court should stay or immediately reverse the revocation of bail, and should itself grant bail pending the remainder of this criminal case.

11. There are serious issues as to the way in this Court re-cast and used Morrison / Absolute to uphold convictions.

12. There two serious petitions for rehearing and en banc

rehearing in this Court.

13.    And the issue is likely one, in the end, for the Supreme Court.

14.    Defendants are NOT BAIL / FLIGHT RISKS.

15.    Though Judge Sullivan revoked bail and as to Alberto Vilar said he cannot even remain out while we ask for a stay, at the same time the very US Attorney in charge of this case, *consented* to Mr. Vilar's travel over the Thanksgiving weekend, as did Mr. Vilar's pretrial services officer.  The pretrial services officers have *concurred* – and have agreed (and, we understand, have told Judge Sullivan previously) that these men are not flight risks and have complied with all bail conditions:

> **From:** Naftalis, Benjamin (USANYS) [mailto:Benjamin.Naftalis@usdoj.gov]
> **Sent:** Tuesday, November 12, 2013 3:33 PM
> **To:** Vivian Shevitz
> **Subject:** RE: What is your position on Vilar travel over Thanksgiving....
>
> No objection, so long as Pretrial Services/Probation consent.
>
> **From:** Vivian Shevitz [mailto:vivian@shevitzlaw.com]
> **Sent:** Tuesday, November 12, 2013 1:05 PM
> **To:** Naftalis, Benjamin (USANYS)
> **Cc:** vivian@shevitzlaw.com
> **Subject:** What is your position on Vilar travel over Thanksgiving....
>
> Ben:  I am going to ask the Court for permission for Alberto Vilar to travel to Florida (with the same person) over the Thanksgiving weekend.   Can you tell me what your position is/ will be, and whether we can arrange this with pre-trial services?
>
> Also for Gary, to remain out later on Thanksgiving night (till, say, 1:30).

16.    This Court should stay the revocation or – more appropriately – grant bail while the Courts review these serious legal issues carefully.  (In this Court's footnote 40, the panel "le[ft] it to the District Court to considering the first instance the

question of whether bail should be granted pending any petition for certiorari." Judge Sullivan shows that he is more concerned about punishing these men than considering the serious legal issues. Twice this Court has reversed Judge Sullivan's orders denying bail. It should do so again.

17.     This Court should stay Judge Sullivan's ruling revoking bail (DOC 633 attached), grant bail unequivocally, and remove Judge Sullivan for reasons shown in the pending motion to recuse. DOC 621-624 in the criminal case and the reply submission, DOC 631 (Attached).

18.     I am making these papers on an emergency basis and apologize in advance for the hurried tone. Judge Sullivan issued his revocation less than an hour ago. I have had to respond instantly to get a stay of the Order requiring my clients to surrender tomorrow.

19.     If this Court has any doubt as to the *propriety* of granting bail I ask that it allow further briefing while the revocation is stayed.

Dated:  South Salem NY
        November 19, 2013      ___s/_____
                                    Vivian Shevitz

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDS SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____            │
│ DATE FILED: 11-19-13             │
└─────────────────────────────────┘
```

UNITED STATES OF AMERICA

    -v-

ALBERTO VILAR and GARY TANAKA,

                              Defendants.

No. 05 Cr. 621 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

Now before the Court is the government's motion to revoke Defendants' bail. (Doc. No. 602.) For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Previous Proceedings

Defendants Alberto Vilar ("Vilar") and Gary Tanaka ("Tanaka") were indicted in 2005 on charges including conspiracy to commit securities fraud, investment advisor fraud, mail fraud, wire fraud, and money laundering. (Doc. Nos. 7, 16, 133.) After a jury trial in 2008, Vilar was convicted on all counts and Tanaka was convicted on three out of twelve courts. *See United States v. Vilar*, 729 F.3d 62, 69 (2d Cir. 2013). The Court revoked Vilar's bail one month later (Doc. No. 334), but continued Tanaka's bail.

On February 15, 2010, the Court sentenced Vilar to 108 months (nine years) imprisonment (Doc. No. 421) and sentenced Tanaka to 60 months (five years) imprisonment (Doc. No. 425). These sentences were well below the range prescribed by the United States Sentencing Guidelines, which for both Defendants was 210 to 262 months (about 17 to 22 years). (Tr. of Feb. 5, 2010 Sentencing, Doc. No. 434 ("Sent'g Tr."), at 26:4–6; 86:22–24.) Each Defendant filed an appeal

within days (Doc. Nos. 426, 427), but they nevertheless began serving their sentences.  Vilar –
who had already been imprisoned – was remanded to the custody of the United States Marshals
after sentencing (Doc. No. 421), and Tanaka was ordered to report to his assigned correctional
facility on April 5, 2010 (Doc. No. 425), later extended to May 17, 2010 (Doc. No. 441).

Because of numerous extensions of the parties' filing deadlines in the Second Circuit, the
appeals were not fully submitted until mid-2012.  At that time, Defendants submitted a motion for
bail pending appeal.  (Doc. No. 519.)  Defendants argued that their appeal raised substantial issues
that were "likely to result in reversal and dismissal of all counts."  (*Id.* at 2.)  The Court was
unpersuaded and found that Defendants (1) had not raised a substantial question on appeal; and (2)
were both flight risks.  (Doc. No. 527 at 1–2.)  The Court found that Vilar was a flight risk
because of his past pattern of dishonesty, his ties abroad, and the seven years remaining on his
sentence, and found that Tanaka was a flight risk because of his ties abroad and the two-and-a-half
years remaining on his sentence.  (*Id.*)  Defendants appealed that order, and the Second Circuit
granted bail pending appeal, remanding to the Court to set appropriate conditions.  (Doc. No. 538.)

Almost a year later, on August 30, 2013, the Court of Appeals announced that it was
affirming Defendants' conviction, vacating their sentence, and remanding to the Court for
resentencing in light of *United States v. Morrison*, 130 S. Ct. 2869 (2010), which had been
decided while the appeal was pending and had overruled previously controlling Second Circuit
precedent.  *Vilar*, 729 F.3d at 70, 98–99.  The Court of Appeals, however, issued an opinion and
judgment only.  It stayed the issuance of its mandate pending the determination of Defendants'
petition for rehearing or rehearing en banc (Doc. No. 543, *United States v. Vilar*, No. 10-521-cr
(L) (2d Cir. Sept. 11, 2013)), which has not yet been fully submitted.

2

### B.  The Current Motion

The same day that the Court of Appeals issued its judgment, the government requested a conference to address Defendants' bail status.  (Doc. No. 588 at 4.)  The Court held a conference on September 27, 2013 and set a schedule for each side to brief whether continued bail was appropriate.  (*See* Doc. No. 598.)  The government submitted its brief on October 4, 2013 (Doc. No. 602), and each Defendant submitted a brief on October 18, 2013 (Doc. Nos. 610, 611).  The Court heard oral arguments on October 25, 2013 and allowed supplemental briefing on the question of whether the appropriate standard to apply was the standard for bail pending sentencing, pursuant to 18 U.S.C. § 3143(a), or for bail pending appeal, pursuant to 18 U.S.C. §3143(b).  All parties submitted supplemental briefing on October 28, 2013.  (Doc. Nos. 615–617.)

## II.  DISCUSSION

In deciding this motion, the Court must address three issues.  First, the Court must determine whether it properly has jurisdiction.  Second, the Court must decide what standard controls the decision to grant bail.  And third, the Court must apply that standard to each of the Defendants.  As will be explained in greater detail, the Court determines that it does have jurisdiction, that the proper standard is that for bail pending appeal, and that bail for each Defendant should be revoked.

### A.  Jurisdiction

The Court has previously stated that "[e]ven though the mandate has not issued, this Court retains jurisdiction over the persons of the defendants at least for the limited purpose of reviewing, altering, or amending the conditions under which the court released the defendants."  (Doc. No. 588 at 3 (quoting *United States v. Sattar*, No. 02 Cr. 395 (JGK), 2009 WL 4038461, at *1 (S.D.N.Y. Nov. 18, 2009))).  The Second Circuit apparently shares this view.  *See Vilar*, 729 F.3d

3

at 99 n.40 ("We leave it to the District Court to consider in the first instance the question of whether bail should be granted pending any petition for certiorari."). To avoid any uncertainty or doubt, however, the Court now addresses this issue more thoroughly.

As a general matter, a notice of appeal transfers jurisdiction over "those aspects of the case involved in the appeal" from the district court to the appellate court. *See Negron v. United States*, 394 F. App'x 788, 792 (2d Cir. 2010) (citing *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)). That jurisdiction remains with the appellate court until the issuance of the mandate. *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996). As far as jurisdiction is concerned, the appellate court's rendering of an opinion or summary order has no effect – only the mandate transfers jurisdiction. *United States v. Rivera*, 844 F.2d 916, 920–21 (2d Cir. 1988). In this case, although the Second Circuit has published its decision affirming Defendants' convictions and remanding for resentencing, it has not issued its mandate. The conviction and sentencing are therefore still, technically, on appeal and this Court lacks jurisdiction over those issues.

But the lack of jurisdiction over conviction and sentencing issues does not settle the question of the Court's jurisdiction to consider bail. The rule that an appeal divests the district court of jurisdiction exists "to avoid confusion or waste of time resulting from having the same issues before two courts at the same time." *Rodgers*, 101 F.3d at 251. It follows by contraposition that when an issue has not been appealed – and thus is not before the appellate court – there is no risk of confusion or waste of time and the issue remains within the district court's jurisdiction. *See N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989) ("[T]he filing of a notice of appeal only divests the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal.") Under that reasoning, because the Court's previous

4

decisions on bail are not on appeal, the Court would still have jurisdiction over bail determinations.

Moreover, the rule that an appeal divests the district court of jurisdiction "is not a per se rule. It is a judicially crafted rule rooted in the interest of judicial economy . . . ." *Rodgers*, 101 F.3d at 251. The rule should therefore accommodate the practical reality that district courts are often best suited to address fact-intensive and fast-moving bail questions, at least in the first instance. If a defendant violates his bail conditions or circumstances require immediate modification of a condition, an appellate court may not have time to convene, learn all the facts of the case, or take evidence. The district court, on the other hand, has usually overseen the case from the beginning, is familiar with the facts, is accustomed to taking evidence, and – as a single-judge court – is structured for faster action. *Cf. United States v. Abuhamra*, 389 F.3d 309, 318 (2d Cir. 2004) ("We defer to the district court on [factual findings in bail] matters because of its unique insights into the defendant as an individual and into his personal, professional, and financial circumstances."). Indeed, federal law reflects these considerations. Both the Bail Reform Act and Rule 9 of the Federal Rules of Appellate Procedure assume that a district court has jurisdiction to grant or deny bail while an appeal is pending. *See* 18 U.S.C. § 3141(b); Fed. R. App. P. 9(b).

Accordingly, the Court finds that it has jurisdiction to consider bail.

### B. The Appropriate Standard for Granting Bail

Section 3143 of the federal criminal code, part of the Bail Reform Act of 1984, provides two different standards for granting bail. 18 U.S.C. § 3143. Subsection 3143(a) provides the standard for granting bail pending sentencing. Subsection 3143(b) provides the standard for granting bail pending appeal by the defendant. When a defendant has been convicted and awaits sentencing, a court must deny bail unless it "finds by clear and convincing evidence that the

5

person is not likely to flee or pose a danger to the safety of any other person or the community if released."  18 U.S.C. § 3143(a)(1).  When, on the other hand, a defendant has been sentenced to imprisonment and has filed an appeal or a petition for a writ of certiorari, a court must deny bail unless it finds (1) "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released"; *and* (2) that the appeal raises a substantial question of law or fact likely to result in a reversal, a new trial, or a sentence that will be less than the total time already served prior to and during the pendency of the appeal. 18 U.S.C. § 3143(b).

As discussed above, the Second Circuit has issued its judgment but not its mandate.  As a result, this case is technically still on appeal and Defendants' sentences are still technically in force.  Thus, the Court must apply the standard for bail pending appeal.  The Court recognizes that this outcome is, in some respects, unusual – Defendants must meet a higher standard now, when there is still some theoretical hope that their convictions could be reversed, but will be held to a lower standard as soon as the mandate issues and officially affirms their convictions.  But to hold otherwise, even if simpler, would be contrary to the clear language of the bail statute. Accordingly, the Court must grant bail if and only if both prongs of the subsection 3143(b) standard are satisfied.

## C.  Application

The Court previously found that both Defendants were flight risks and that their appeal did not raise substantial issues.  (Doc. No. 527 at 1–3.)  The Second Circuit, however, subsequently reversed the Court's order and granted Defendants bail.  (Doc. No. 538.)  Although the Second Circuit did not state the reasons for its decision, it must have found that the issues on appeal were substantial *and* that the Court's factual findings as to risk of flight were clearly erroneous.  *See* Fed. R. App. P. 9(c) (requiring an appellate court to make its decision regarding release in

6

accordance with 18 U.S.C. § 3143); *Abuhamra*, 389 F.3d at 318 ("In reviewing a detention challenge, we examine the district court's factual determinations for clear error. This clear error standard applies not only to the court's specific predicate factual findings but also to its overall assessment, based on those predicate facts, as to the risk of flight or danger presented by defendant's release." (citations omitted)).

Nevertheless, while the Second Circuit's findings must inform the Court's decision, they cannot control the decision at this point. Since the time when the Second Circuit granted bail, the situation has changed – the Second Circuit has announced its judgment affirming Defendants' convictions. Although the mandate has not issued, and the appeal is not final, the announcement of judgment is itself relevant to Defendants' risk of flight and to the substantiality of their remaining appeal. Whatever chances Defendants once had for having their conviction reversed, the odds are now lower. That change in odds in turn increases Defendants' risk of flight. The Court must consider this new fact in deciding whether to grant bail.

With both the Second Circuit's past holding and the changed circumstances in mind, the Court now turns to the two-pronged standard for bail pending appeal.

### 1. Risk of Flight

Releasing a convicted defendant can be a risky proposition. If a convict flees, the law is flouted and justice is left undone. The Bail Reform Act aimed to eliminate that risk. *See Abuhamra*, 389 F.3d at 318 ("[P]resent federal law disfavors release on bail [after conviction]."). The statute requires a court to deny bail pending appeal unless it "finds by clear and convincing evidence that the [defendant] is not likely to flee or pose a danger to the safety of any other person or the community if released." 18 U.S.C. § 3143(b)(1)(A). Notably, a finding that a defendant "is not likely to flee" is not the same as a finding that a defendant will probably not flee or that the defendant is more likely than not to stay put. Even before conviction, a court must order detention

7

if it finds that the defendant's appearance cannot be "reasonably assure[d]," 18 U.S.C. 3142(e)(1),

which suggests that far more than 51% confidence that the defendant will not flee is required.

After conviction, the standard is meant to be far more onerous. As such, "not likely to flee" means

there is no reasonable risk that the defendant will flee, in the sense that a reasonable person would

not worry that the defendant might flee. *See United States v. Lea*, 360 F.3d 401, 403 (2d Cir.

2004) (requiring a finding that a defendant "posed no risk of flight" to satisfy section 3143);

*United States v. DiSomma*, 951 F.2d 494, 496 (2d Cir. 1991) ("To satisfy [paragraph 3143(b)(1)],

the trial judge must find that the person poses no risk of flight . . . ."). Moreover, the defendant

bears the burden of proving that there is no risk of flight. *United States v. Randell*, 761 F.2d 122,

125 (2d Cir.1985).

### a. Alberto Vilar

Subsection 3142(g) sets forth a list of factors for courts to consider in determining risk of

flight.[1]  Among these factors are "the person's character, physical and mental condition, family

---

[1] The full text of 18 U.S.C. § 3142(g) reads:

(g) Factors to be considered. – The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning –

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including –

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

ties, employment, financial resources, length of residence in the community, community ties, past

conduct, history relating to drug or alcohol abuse, criminal history, and record concerning

appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). Vilar did not focus on these factors

in his submissions or in his arguments at the bail hearing, but most weigh against his release.

Vilar provides no evidence of family ties, community ties, or employment in the district. He does

not make any attempt to defend his character. Vilar's physical and mental condition –

particularly, his age – could make it more difficult for him to flee, but they also increase his

incentive to flee. *Cf. United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (upholding a

court's denial of bail based on the defendant's age and the length of a potential sentence).

Similarly, Vilar appears to have limited financial resources,[2] which could make it harder for him

to flee, but which also gives him less to leave behind. Among these factors, the only factor that

unambiguously favors Vilar is his history of compliance with bail conditions. (*See* Doc. No. 611

¶¶ 10–11.) But this factor is relatively weak: most convicted felons who flee while on bail were,

for a time, in compliance with their terms of release – until one day they were not.

---

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

[2] *But see Madoff*, 316 F. App'x at 59 ("[T]he district court was not required to treat this defendant's financial representations as reliable. The defendant . . . has had ample opportunity over a long period of time to secret substantial resources outside the country.").

Instead of focusing on the statutory factors, Vilar argues that the government's arguments regarding his risk of flight are flawed (Doc. No. 611 ¶ 4–8) and that he is unlikely to flee because (1) he is in a serious relationship with an unnamed woman in Queens (*id.* ¶ 9); (2) he has no passport and could not flee (*id.* ¶ 8); (3) he wants to stay to collect on the surplus investment assets he believes he will be entitled to when the case is resolved (*id.* ¶ 11); and (4) he believes he will not serve significant time in prison (*id.* ¶¶ 18–19).

Vilar's criticism of the government's position misses the point. Vilar bears the burden – the government does not need to provide any evidence or any arguments. The sole question is whether Vilar himself can establish that there is no reasonable risk that he will flee. Additionally, Vilar's argument that his risk of flight is no greater than any other convicted felon's falls particularly wide of the mark. (Tr. of October 25, 2013 Bail Hearing, Doc. No. 625 ("Bail Tr."), at 20:16–23.) Federal law applies a "presumption[] of danger and flight" to convicted felons. *Abuhamra*, 389 F.3d at 316. Thus, to the extent Vilar is similar to other convicted felons, federal law requires that he be imprisoned.

As for Vilar's affirmative arguments, most fail to show how he is sufficiently different from the run-of-the-mill convicted felon to establish that there is no risk he will flee. Vilar has been in a relationship for several years, but that is true for many, if not most, convicted felons. Further, Vilar has provided no evidence of his partner's ties to the district that would prevent her from fleeing with him. Vilar does not have a passport, but his lack of a passport is counterbalanced by his fluency in Spanish, his ties abroad, and his time spent living abroad.

The arguments that distinguish Vilar – that he hopes to collect surplus assets and that he believes he will not go back to prison – are entirely unpersuasive. Vilar has provided no evidence or any reason to believe that there will be any surplus assets for him to collect once his victims and the other investors have been paid. (Bail Tr. at 18:9–22.) To the contrary, according to the

10

Receiver in the related SEC case, there are not even enough assets to pay investors in full. (Doc. No. 329, *SEC v. Amerindo Inv. Advisors Inc.*, No. 05 Civ. 5231 (RJS).)  With respect to sentencing considerations, the Second Circuit specifically found that losses to at least three groups of investors – Lilly Cates, the Mayer Family, and Graciela Lecube-Chavez – could properly be considered under *Morrison. Vilar*, 729 F.3d at 76–79.  Counting those investors alone, the losses add up to over $20 million. (Sent'g Tr. at 23:25–24:5.)  That loss amount leads to precisely the same Guidelines range that Vilar faced at his first sentencing.  (*Id.* at 24:16–19 (holding that the Guidelines range is unaffected as long as the losses are over $20 million and less than $50 million)).  Moreover, the Circuit's ruling directs the Court to consider additional losses as potentially relevant conduct.  *Vilar*, 729 F.3d at 96.  As a result, there is a real risk that Vilar's sentencing prospects will be unchanged or worse at the second round of sentencing.

True, the Court must conduct a de novo sentencing, *Vilar*, 729 F.3d at 99, and could, ultimately, sentence Vilar even further below the Guidelines than it did at the first sentencing.[3] But the Court could also sentence Vilar within the Guidelines, which would mean a significantly higher sentence.  That danger gives Vilar ample incentive to flee.  Accordingly, the Court finds that Vilar has failed to demonstrate by clear and convincing evidence that he is not likely to flee if released.

---

[3] Vilar has accused the Court of prejudging his sentence and has even filed a motion for recusal based on the Court's appearance of impropriety and partiality.  (Doc. Nos. 621, 622 ¶ 32.)  This argument misses the mark.  Although the Court will certainly conduct a de novo sentencing proceeding upon the issuance of the mandate, the government's motion to revoke bail requires the Court to assess Defendants' risk of flight, which necessarily entails an analysis of the potential sentence faced by Defendants.  Moreover, nothing in the Second Circuit's opinion or in the bail statute requires the Court to disregard knowledge and information acquired while presiding over the case.  To the contrary, the bail statute and Second Circuit precedent make clear that district courts are encouraged to rely on such information, which can provide "unique insights into the defendant as an individual and into his personal, professional, and financial circumstances." *Abuhamra*, 389 F.3d at 318.

## b.  Gary Tanaka

Tanaka's situation is different, but not different enough to justify a contrary result.  In his submission, Tanaka states that he has a mother and two sisters living in America and that he is currently in a serious relationship with Vivian Shevitz, Vilar's counsel.  (Doc. No. 610 at 2.)  He also argued at the bail hearing that he has less incentive to flee because he has already served two-and-a-half years and – assuming he received a similar term of imprisonment on resentencing – would only have two-and-a-half years left.  (Bail Tr. at 13:16–24.)  But a romantic relationship and family ties within the country – not the district – are insufficient to satisfy Tanaka's burden. Just as with Vilar, these do not distinguish Tanaka from the run-of-the-mill convicted felon who is presumptively a flight risk.  Further, Tanaka's argument that he is not likely to flee to avoid a two-and-a-half year sentence is flawed for two reasons.  First, it ignores the possibility that Tanaka's sentence after de novo resentencing could in fact be higher.  Second, it relies on the dubious assumption that a person would prefer to serve two-and-a-half years in prison than take his chances on the run.  If that assumption were valid, there would be a general rule that convicted felons sentenced to two-and-a-half years or less are outside of the presumptive risk of flight – which, of course, is not the law.  Indeed, that assumption is particularly unfounded for a man of Tanaka's age and health.  Tanaka is seventy years old and has a history of cancer.  At this point, two-and-a-half years may be more than he is willing to risk.  *Cf. Madoff*, 316 F. App'x at 59.

Although the Court takes into account the factors emphasized by Tanaka, his arguments do not establish that he is so unlikely to flee that the Court, the government, and the community can all rest at ease.  Considering the Second Circuit's affirmance of Tanaka's conviction and the possibility that he could, under the Guidelines, face up to twenty more years in prison, the Court has no confidence that Tanaka will not flee.  Accordingly, the Court finds that Tanaka has failed to demonstrate by clear and convincing evidence that he is not likely to flee if released.

12

## 2. Substantial Question on Appeal

Because Defendants each raise the same issues on appeal, the Court addresses the second prong – whether the appeal raises a substantial question likely to result in a reversal, a new trial, or a sentence that will be less than the total time already served – for both Defendants simultaneously.

Put simply, the second prong asks whether there is a reasonable likelihood that a defendant will not face further imprisonment. *See Randell*, 761 F.2d at 125 ("[A substantial question] is a 'close' question or one that very well could be decided the other way." (internal quotation marks omitted)). If a convicted felon will ultimately be imprisoned anyway, there is no benefit in putting off the inevitable. But if there is a reasonable likelihood that the appeal will result in a defendant's release, then any further imprisonment is potentially unnecessary. As long as the defendant is not dangerous or a flight risk, the benefit of avoiding that potentially unnecessary imprisonment justifies bail.

By granting bail, the Second Circuit implicitly held that the issue originally raised in the appeal was substantial and, if decided in Defendants' favor, was likely to result in Defendants' ultimate release. That previous holding, however, offers little guidance for the present situation. As the facts stand now, three appellate judges have unanimously affirmed Defendants' convictions. The question that was close a year ago now appears to be settled.

Defendants argue that they have a strong petition for rehearing en banc and hope to see the Second Circuit panel reversed. (Doc. No. 614 at 3.) As a matter of sheer probability, the odds are hardly in Defendants' favor. Rehearing en banc and certiorari are exceedingly rare. (*Id.*) Moreover, putting probabilities to the side, the Court finds that Defendants' remaining appellate arguments are not close. Defendants' arguments that the panel misapplied plain error or violated Defendants' jury rights are not supported by precedent. Indeed, at base, Defendants' claims – that

13

a new trial is necessary to allow cross-examination on the question of domesticity – are an attack on the very idea of harmless error. Further, Defendants' arguments regarding what makes a transaction domestic and Defendants' claims that a criminal securities fraud conviction should require a showing of reliance are directly contrary to precedent. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67–68 (2d Cir. 2012); *SEC v. Apuzzo*, 689 F.3d 204, 213 (2d Cir. 2012).

Admittedly, sometimes legal outcomes can be surprising. Nevertheless, the bail standard is focused on reasonable likelihoods, not lucky breaks. Here, Defendants' appeal raises no substantial issues likely to result in a reversal, a new trial, or a sentence that will be less than the total time already served. As noted above, this determination is not a prejudgment of Defendants' resentencings, which are not yet before the Court. Nevertheless, the Bail Reform Act requires the Court to consider the likely sentencing and appellate outcomes confronting Defendants at this time. Having done so – particularly in light of the Second Circuit's holdings with respect to the frauds perpetuated by Defendants against Lilly Cates, the Mayers, and Graciela Lecube-Chavez – the Court finds that the reasonably likely outcome is that, in the end, Defendants will return to prison. Accordingly, the Court determines that neither Defendant satisfies the second prong of the standard for bail pending appeal.

As such, the Court revokes bail for both Defendants.

### D. Stay Pending Appeal

At the bail hearing, Vilar requested that any revocation of bail be stayed pending appeal. (Bail Tr. at 31:24–32:11.) To determine whether to grant a stay pending appeal, a court must consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the

14

public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).  The first factor weighs against a stay.  Although there might be some likelihood that the Circuit could again find that Vilar is not a flight risk, the Court finds it exceedingly unlikely that the Circuit could find that Vilar has raised a substantial issue on appeal.  This is especially so given that Vilar's only argument left on appeal is that the Circuit panel itself misapplied Second Circuit precedents and the plain-error standard.  The second factor, on the other hand, favors a stay – unnecessary imprisonment is always irreparable injury.  But the third and fourth factors decisively come out against a stay.  Vilar is a flight risk – if he is allowed to stay free and flees, the government will be prejudiced and the public will suffer.  Accordingly, the Court denies Vilar's request for a stay pending appeal.[4]

### III.   CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT bail is revoked.  Defendants shall surrender to the United States Marshals no later than November 20, 2013.  The clerk of the court is respectfully directed to terminate the motion pending at docket number 602.

SO ORDERED.

Dated:     November 19, 2013
           New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

---

[4] Tanaka did not join this request, but to the extent he would have, his request would be denied for the same reasons.

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
│ USDS SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____      │
│ DATE FILED: 11-19-13        │
└─────────────────────────────┘
```

UNITED STATES OF AMERICA

-v-

ALBERTO VILAR and GARY TANAKA,

Defendants.

No. 05 Cr. 621 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

Now before the Court is Defendant Vilar's motion for the Court to recuse itself.[1] (Doc. No. 623.) The Court assumes the parties' familiarity with the facts and background of this case.

Vilar's memorandum in support of his motion is nineteen pages long and is formatted like an affidavit. (Memorandum in support of the motion to recuse, Doc. No. 624 ("Mem.").) Its first line states, "Vivian Shevitz, under penalty of perjury, hereby declares:" (Mem. at 1), and the rest is organized into numbered paragraphs. This organization, however, is largely unhelpful to the reader. Despite its structure, the memorandum is a virtual stream-of-consciousness litany of grievances and conspiratorial accusations.

This litany is mostly focused on two claims. First, Vilar alleges that the Court has violated the Southern District's related case rule and has thus created the appearance of

---

[1] Although this motion was submitted by Defendant Vilar's attorney, Vivian Shevitz, and is not signed by Defendant Tanaka's attorney, it purports to be filed on behalf of both Vilar and Tanaka. This confusion is part of a larger cloud currently surrounding Tanaka's representation. Since the filing of this motion, Tanaka's attorney has filed a motion seeking leave to withdraw as counsel, citing actions taken by Tanaka that she "considers repugnant" or "with which [she] has a fundamental disagreement." (Doc. No. 630.) In addition, Ms. Shevitz has filed a letter, also purportedly on Tanaka's behalf, stating Tanaka's desire to proceed pro se. (Doc. No. 631 at 10.) For the time being, Tanaka may speak only through his own appointed counsel. As such, the Courts treats the current motion as filed by Vilar alone.

partiality. (Mem. ¶ 2.) Second, Vilar alleges that the Court is actually biased against him. (*See, e.g.*, Mem. ¶¶ 7, 9, 13, 14, 28, 32, 38.) As explained below, these claims are meritless. As such, the motion is denied.

## I. DISCUSSION

"In deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case. Litigants are entitled to an unbiased judge; not to a judge of their choosing." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988) (citations omitted).

"A judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *Id.*

### A. Alleged Violations of the Related Case Rule

Vilar argues that the Court has twice violated the district's related case rule, Local Rule 13, and that under *Ligon v. City of New York*, Nos. 13-3123 and 13-3088, 2013 WL 5835441 (2d Cir. Oct. 31, 2013), these violations are grounds for recusal. Specifically, Vilar claims that the Court improperly accepted two civil cases, *SEC v. Amerindo Investment Advisors Inc.*, No. 05 Civ. 5231 (RJS), and *In re Mayer*, No. 12 Civ. 5240 (RJS), as related to this criminal case, in violation of Local Rule 13(b) ("Criminal cases are not treated as related to civil cases or vice versa."). (Mem. ¶¶ 3–5.) Even the most cursory review of Local Rule 13 and the record below, however, reveals that Vilar's claims are entirely frivolous.

First, *SEC v. Amerindo Investment Advisors Inc.* was never accepted under Rule 13 as a related case. That case was transferred to the Court's docket from Judge Swain's docket by joint Order of both judges, as specifically authorized by Local Rules 13(f) and 14. (*See* Doc. No. 219 at 3, *SEC v. Amerindo Investment Advisors Inc.*, No. 05 Civ. 5231 (RJS)); *see also* Local Rule

13(f) ("Nothing contained in this rule limits the use of Rule 14 for reassignment of all or part of any case from the docket of one judge to that of another by agreement of the respective judges."); Local Rule 14 ("Any judge, upon written advice to the assignment committee, may transfer directly any case or any part of any case on that judge's docket to any consenting judge except where Rule 16 applies."). Needless to say, the transfer was approved by the Southern District's reassignment committee.

Second, although *In re Mayers* was accepted as related to this case, any error was ministerial only – *In re Mayers* should have been marked and accepted as related to *SEC v. Amerindo Investment Advisors Inc.*, which was already on this Court's docket. *In re Mayers* is an attempt by victims of Vilar's fraud to execute a state court judgment premised on the same conduct underlying the SEC action. No one could dispute that there is "a congruence of parties [and] witnesses" between the two cases or that their consolidation and coordination before one judge will serve "the interests of justice and efficiency." Local Rule 13(a). Indeed, even Vilar himself makes no effort to argue otherwise.

Nor does *Ligon* support Vilar's argument. The problem in *Ligon* was not that Rule 13 was violated, but instead that the way Rule 13 was violated created an appearance of partiality. *See Ligon*, 2013 WL 5835441, at *1 ("[T]he appearance of impartiality surrounding this litigation was compromised by the District Judge's improper application of the Court's 'related case rule.'"). The Circuit was specifically troubled by the district court judge's personal solicitation of the plaintiffs to bring a related case. *Id.* at *1 n.1 (quoting the district court judge as saying, "If you got proof of inappropriate racial profiling in a good constitutional case, why don't you bring a lawsuit? You can certainly mark it as related. . . . What I am trying to say, I am sure I am going to get in trouble for saying it, for $65 you can bring that lawsuit. . . . And as I

3

said before, I would accept it as a related case, which the plaintiff has the power to designate.") *see also In re Reassignment of Cases*, Nos. 13-3123 and 13-3088, 2013 WL 5998139, at *3 (2d Cir. Nov. 13, 2013) ("The appearance of partiality stems in the first instance from comments made by [the judge in *Ligon*] that a reasonable observer could interpret as intimating her views on the merits of a case that had yet to be filed, and as seeking to have that case filed and to preside over it after it was filed."); *id.* at *4 n. 17 ("In any event, the gravamen of why reassignment of this case is necessary is not simply the use of Local Rule 13. It is the appearance of partiality that was created by [the judge's] conduct throughout the December 21, 2007 hearing in suggesting that the plaintiffs bring a lawsuit, outlining the basis for the suit, intimating her view of its merit, stating how she would rule on the plaintiffs' document request in that suit, and telling the plaintiffs that she would take it as a related case . . . ."). No similar personal solicitation existed or is alleged in this case.[2]

Accordingly, the Court finds no basis for recusal due to any purported violations of Local Rule 13.

### B. Alleged Actual Partiality

Vilar further argues that the Court is actually biased against him because it has ruled against him on numerous occasions (Mem. ¶¶ 7, 9, 13, 14, 28, 38) and because it "has allowed 'understandings' from the criminal case that have not budged to drive the case" (Mem. ¶ 32). Again, this argument is frivolous. "The Supreme Court has held that judicial rulings and the opinions formed by judges on the basis of facts introduced in the course of proceedings 'almost never constitute a valid basis for a bias or partiality motion . . . unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *United States v. Yousef*,

---

[2] *Ligon* also involved media interviews by the district court judge, *Ligon*, 2013 WL 5835441, at *1, which have not occurred and are not alleged to have occurred in this case.

327 F.3d 56, 170 (2d Cir. 2003) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). The Court has ruled against Vilar solely on the merits and has formed opinions only on the basis of facts in the record. Such rulings are not grounds for recusal.

Vilar also accuses the Court of instructing the SEC to submit a motion for summary judgment in *SEC v. Amerindo Investment Advisors Inc.* and providing precedent for the SEC to use in its motion. (Mem. ¶ 10.) In reality, however, the Court merely set a deadline for submission of a pre-motion letter on anticipated motions by the SEC. (*See* Doc. No. 221 at 1–2, *SEC v. Amerindo Investment Advisors Inc.*, No. 05 Civ. 5231 (RJS) ("The Court is also in receipt of a letter from Plaintiff, dated March 14, 2012, stating that it 'reserves its right to seek leave to amend the amended complaint in this action.' Accordingly, IT IS FURTHER ORDERED THAT, should Plaintiff wish to file any motion at this time, such as a motion to amend or a motion for summary judgment based on collateral estoppel, *see SEC v. Shehyn*, No. 04 Civ. 2003 (LAP), 2010 WL 3290977, at *3 (S.D.N.Y. Aug. 9, 2010) ("'It is well-settled that a criminal conviction, whether by a jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by judgment in the criminal case.'" (quoting *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978))), it shall also submit a pre-motion letter no later than April 6, 2012[, the same deadline set for Defendants' pre-motion letter].").) Although the Court cited precedent on the collateral estoppel issue, there is nothing improper about calling parties' attention to obviously relevant case law. Doing so advances judicial economy and reduces unnecessary muddling by all parties and the Court.

Vilar makes numerous other claims of the Court's alleged actual partiality. In keeping with the memorandum's affidavit format, none of these claims are supported by any case citations. For the most part, they are not supported by record citations. To the extent there are

5

record citations, Vilar selectively quotes and distorts the record. (*Compare* Mem. ¶ 35 ("[T]he Court made 'findings' on an ex parte basis that the defendants were 'cute' and intended to 'mess with the receiver.'"), *with* Tr. of Oct. 25, 2013 Status Conference, Doc. No. 326 at 30:14–18, *SEC v. Amerindo Investment Advs.*, No. 05 Civ. 5231 (RJS) ("I didn't issue a gag order or an order preventing it. So, I haven't held anybody in contempt. I'm not going to do that, but I do think it was a little cute, and it did suggest to me that there's a real intention here to mess with the receiver in the tasks he's been given.")). None come close to an allegation of "deep-seated favoritism or antagonism that would make fair judgment impossible." *Yousef*, 327 F.3d at 170.

In short, the Court finds no basis for recusal due to any actual partiality.

## II. CONCLUSION

For the foregoing reasons, Defendant Vilar's motion for the Court to recuse itself is DENIED. The clerk of the court is respectfully directed to terminate the motion pending at docket number 623.

SO ORDERED.

Dated:     November 19, 2013
           New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

Vivian Shevitz
Attorney at Law
46 Truesdale Lake Drive
South Salem, New York 10590
914-763-2122
vivian@shevitzlaw.com

November 17, 2013

Hon. Richard J. Sullivan
U.S. District Judge, SDNY
40 Centre Street
New York New York 10007

Re:  United States v. Vilar and Tanaka
05 cr 621 (RJS) and all related cases

Dear Judge Sullivan:

I write in reply to the government's opposition (in two submissions) to the motion for recusal.  In the second submission (DOC 629) the government calls the Court's attention to the superseding opinion by the Second Circuit in the *Ligon*. (*In re Reassignment of Cases,* Case 13-3442, DOC 98, 11/13/13).  We do not know why the government finishes its recitation with a statement that our motion for recusal is "all the more frivolous today."  DOC 629 p.2.

To the contrary the new *Ligon* Court opinion says disqualification is required under 28 USC 455(a) when the court "used" the related case rule in a *procedurally* improper way to accept a related case when the case otherwise "fits" the Court's related case rule.  Here, Judge Sullivan (we use the third person  for clarity, though addressing the letter to Judge Sullivan, as the focus of this recusal motion is Judge Sullivan's conduct) court **mis**used the "related case" rule *twice*, to transfer civil cases to a criminal case.   This is a **substantive** violation of the "related case" provision:  criminal and civil cases *are not related.*   It leaves no room for discretion.  Judge Sullivan knew that.

In a letter we have never seen before AUSA Naftalis provided it to me on November 14, 2013 (after discussing it in his recusal opposition) – a letter unfiled on the docket and not provided to the defendants when delivered to Judge Sullivan --an Assistant US Attorney wrote Judge Sullivan on July 16, 2012, four months before we ever learned of the existence of this case (filed by one of the testifying witnesses) against JP Morgan to "get" the defendants' property, the government wrote privately to Judge Sullivan that though the case-transfer rules "do not apply when one case is civil and the other case criminal" (citing Rule 13(b)), the Court should take the case anyway because "this case's subject matter overlaps with a criminal matter before Your Honor captioned *United States v. Vilar*,... because the petition contains allegations concerning the Government's rights to property ... pursuant to the criminal convictions of Alberto Vilar and Gary Tanaka, and a forfeiture order entered in that criminal case."  ((July 16, 2012 letter, AUSA Onozawa to Judge Sullivan in 12 Civ 5240(UA) (now RJS).   (Since the government did not attach this exceptional letter, and it is not filed on the public docket, we attach it here).

Two days later, on July 18, 2012, Judge Sullivan accepted the case as related (Docket Entry 12 cv 5240 (RJS), 12 cv 5240) – signing off on what the government wanted just as he did when AUSA Litt twice put forfeiture orders with inflated figures before him and asked him to sign them (he did). And on July 27, 2012, Judge Sullivan entered this Order (without notice to the defendants as they were not served with a third party complaint until November 2012 and thus were not "noticed" as parties on the ECF system or otherwise – instructing the parties that he would direct them further after appointing a receiver in the SEC action:

> ORDER: Respondents' time to respond to the Petition is extended until further Order of the Court. Upon receipt of the submissions regarding the appointment of a receiver in the SEC Action, the Court will direct the parties in this action as to how to proceed. (Signed by Judge Richard J. Sullivan on 7/27/2012) (ft) (Entered: 07/27/2012)

The government's response suggests that it "meant" to "relate" the Mayer action to the *civil case* (the SEC action) (DOC 628). The prosecutor writes that at the time of the "acceptance" of the case, "the principal business left before the Court in the criminal case related to the forfeiture and distribution of investors' assets". (DOC 628 p.3) To the contrary, the principal business for the defendants was litigating the *veritas* of the criminal penalty and efforts of the SEC to *further* penalize defendants in the "civil" case merely *because* they would not agree to forfeit *all* "substitute assets".

The government then makes the vague observation that "the SEC action, of course, circumscribed the very same conduct and assets." Apparently this means that the SEC action seeks to "distribut[e] investors' assets" and the assets it seeks to distribute happen to be the same "substitute assets". (However, the SEC has always tied its remedy to the *completion* of "forfeiture" (Feb. 15, 2011 Salzberg letter) – a position the SEC *continued* at the October 25, 2013 conference grudgingly "permitted" by this Court *qua "civil"* SEC Action judge). In other words, as the government states it, because of this confluence of assets and desires of the government/plaintiffs in the two cases, ("[i]n short"), "the SEC case is obviously a related civil action" to the *Mayer* case.

If what the prosecutor "meant" to do, was to "relate" the Mayer case to the SEC case, she would have served *me* as counsel to Gary Tanaka in the SEC case. At the time of the secret "relation" of the *Mayer* "civil" case, I was representing Gary Tanaka in the SEC case and I did not even know about the "related" Mayer case until four months later and *still* am not receiving notices in that case.

The prosecutor then fashions the "remaining business" in these cases as a "civil" matter in any event. "In addition," the government says, "although the forfeiture proceedings stem from the criminal case, they are at this point more civil than criminal in nature."

This is a shocking statement made to two criminal defendants still fighting excessive criminal penalties, including title to and management rights as to their "forfeited" property, the disposition of which is batted around with such ease in *two* "civil" cases for which they cannot get funds to litigate (neither their own restrained funds nor CJA funds) and where their rights to speak are circumscribed by civil "pre-motion" rules, needs to come to court for conferences,

page limits, and bans on saying "too much" as far as the presiding judge is concerned.

The cases cited by the prosecutor deal not with claims involving criminal defendants who are still litigating *in personam* forfeiture and other penalties, but rather third-parties against the government. *United States v. Moser,* 586 F.3d 1089, 1093-94 (8th Cir. 2009) may say that an "ancillary proceeding is more civil than criminal in nature". But the case – instructive because it states that the court had denied forfeiture as to a pension fund as it is protected from forfeiture (*id.* at 1091-92) (but the court has repeatedly refused to release the UK Pension Fund account wrongfully appropriated and held in violation of UK laws) – *holds* that a proceeding under 28 USC 853(n) by a third party challenging the government's title in a criminal case as inferior to his, may be deemed "civil" (though for purposes of awarding fees in the end it is more "criminal" than "civil").

This case is not about 28 USC 853(n), which applies on its face *not* to defendants in a criminal case but to third parties (who are *banned* from intervening in a criminal forfeiture case). This is not an "ancillary" case (and if it is, we should get CJA fees to fight it because defendants are drawn into it to protect their rights). There is no *in rem* forfeiture. This was not a civil forfeiture proceeding (the normal diet from which Sharon Levin derives her knowledge of how to proceed). There are still criminal "forfeiture" matters pending and now there will be at the least a full resentencing proceeding. Taking a civil case as related to the criminal case while it is still pending and while there is a gun to defendants' heads, is not justified by the fact the government asked for that remedy, and is not justified by the fact that two judges agreed to it.

When this Court first "took" the SEC case for its own docket, no one had asked it to do so and it was not authorized in the normal course. Judge Sullivan took the case only after Mr. Tanaka made a motion for dismissal before Judge Swain, who does *not* have a requirement that a party must submit a "pre-motion" letter in order to get a conference in order to make a motion – the "individual" rule imposed by Judge Sullivan *three days* after he transferred the SEC case to himself (3/19/12) to *dismiss* Mr. Tanaka's motion for non-compliance with his own individual rule. (DOC 221, 3/22/13, SEC case requiring new motion after pre-motion conference.) (Days after that the Court ruled in the criminal case that, only because the government had withdrawn its request for a final order of forfeiture, the Court was denying that request, at the same time denying Mr. Vilar's motion for a stay. DOC 518 4/6/12, criminal case).

Judge Sullivan gave no reason for taking the civil SEC case *other than* he had the criminal case and (as the government would say later in the secret July 16, 2012 application for him to take the "related" *Mayer* case) there was a "substantial overlap." The Court (in an Order "joining" captions in both the SEC and criminal case) wrote simply that he was doing it (Order DOC 516, criminal case, 3/19/12):

> Having reviewed the above-referenced submissions, as well as the parties' proposals ... the Court concludes that a consensual distribution of the Substitute Assets to investors is not achievable at this juncture, due to the parties' inability to agree on several necessary terms. Accordingly, the Court in the criminal matter, No. 05 Cr. 621 (RJS), will resolve the government's pending motion for entry of a final order of forfeiture (Doc No. 486) and Defendant 's cross-motion for a

stay of forfeiture pending appeal (Doc. No. 489) in a forthcoming Order.

And then (*id.*, DOC 516 criminal case, 3/19/12):

> "Finally, in light of the substantial overlap between these two cases, the civil matter, No. 05 Civ. 5231 (LTS), will be transferred to Judge Sullivan's docket. SO ORDERED.

"Substantial overlap" between a criminal and civil case does not justify transferring a civil case to the criminal case judge. This is not a "normal course" transfer as discussed in *Ligon.* The transfers came just after Mr. Tanaka filed his motion to dismiss the SEC case on Fifth, Sixth, and Eighth Amendment grounds[1] before Judge Swain (who presided over the first-filed case) [2] and whose individual rules do *not* include any requirement of a pre-motion letter (an "individual" requirement imposed by Judge Sullivan's rules) bespeak partiality—or at least its appearance. [3]

---

[1] This Court hardly addressed our motion except in an offhand oral dismissal on December 11, 2012, p.38-39 stating in essence that the SEC 'always acts this way: "So I am going to deny the motion to dismiss the complaint, the amended complaint. I think the standard is quite clear. The rule in this circuit is to allow a party to amend its pleadings in the absence of a showing by the non-movant of prejudice or bad faith. I don't think that has been shown here. I think this is not that unusual a case, and to the extent it is often the case that the SEC brings a parallel proceeding where there is a criminal proceeding, it is often the case that that civil proceeding is stayed pending resolution of the criminal proceeding. So I think the arguments and facts that are made by the defendants here go to perhaps what are proper remedies, but I don't think it goes to whether or not the amended complaint can be filed. So I am going to deny that motion."

[2] The SEC case was the first-filed case, on June 1, 2005. The criminal case was filed June 9, 2005. (The defendants were arrested on criminal complaints).

[3] By Order dated June 14, 2012 in which Judge Sullivan used the captions of *both* the SEC and the criminal cases (DOC 230, SEC case), the Court wrote that "it" was "in receipt" of a letter from the UK Pension Fund administrator in the UK dated a year earlier "requesting assistance in fulfilling the Adviser's legal responsibilities as to the UK Pension Fund account in that the restraints and circumstances violate UK law. The Court said that the letter was "properly addressed in the first instance" to AUSA Sharon Cohen Levin "who is now handling the forfeiture aspects of this action" – and directed AUSA Levin to respond (and "send a copy of its response to the Court and to the Defendants').

In response to defendants' motion to get these assets *managed,* Judge Sullivan issued an Order dated July 17, 2012 in the criminal case (DOC 530 criminal case) telling the defendants to go seek relief "in a different forum." In a footnote the Court "note[d] that on July 17, 2012 [the same day] it issued an Order in the related case [SEC v. Amerindo] regarding the appointment of a receiver to manage assets in that case." That put defendants back to the "mercy" of the SEC and receiver, who now have said defendants cannot even get *information* about their assets, while at the same time failing to manage them at all.

We brought this up again in objecting to the SEC receiver (appointed pursuant to an order

Even now counsel has to respond (in the civil case) to the Receiver's unsupportable and unsupported three-page tally of assets and claims (DOC 329 SEC case, 11/14/13) -- with our hands tied behind our backs financially and legally, with no funds to hire even one other lawyer to assist in these relentless motions necessary to litigate the "civil" cases, and while the Receiver is allowed to hide documents supporting his "summary analysis". (He provides back-up to "interested parties" but not to the defendants). (What will the Government Entities do when the prosecutor has to *prove* "losses" at a *de novo* resentencing in the criminal case?).

The Court *purposefully* took the SEC case from Judge Swain's docket *because* he had the criminal case. (Conference of May 4, 2012, p.3: "THE COURT: We all know each other and that is really just for the record. This case is now all mine. Judge Swain has passed it over to me because I had the criminal case.") [4]    In a reported statement at the SAC Capital SEC-action-proceeding (where Judge Sullivan is the "SEC judge" but not the criminal case judge though the cases substantially overlap) Judge Sullivan referred to the criminal case as "the main event". *Dealbook*, November 6, 2013,  http://dealbook.nytimes.com/2013/11/06/sacs-1-2-billion-settlement-clears-a-judicial-hurdle/?_r=0))   Judge Sullivan made sure that in the main event he would control the destiny of the civil cases standing in the way of "forfeiture."

In fact Judge Sullivan stated expressly at the May 4, 2012 (pre-motion) conference that Judge Swain had been interested in achieving a settlement (and "I with her") but that the Court "cannot make that happen unless the parties here and the government in the criminal case agree", and that if that did not happen "I will rule on the motions, and maybe the way I will rule on them will make it easier for them to get a special master ...." (May 4, 2012 Tr., SEC case, at p.15). Judge Sullivan then forced summary judgment litigation and imposed a receivership. The receiver has not completed the first task, which is to value the assets, and the judge has said nothing about this failure except to *ask* Ian Gazes now a year after his "appointment", whether it is "in the cards' to get this done. (October 25, 2013 Transcript, SEC conference, p. 27).

In July 2012 the defendants offered a payout plan that included all known investors and their best estimate of amounts due as of May 25, 2005. The government rejected it because it would not release personal assets. (DOC 569-1 filed in criminal case 2/25/13 as exhibit to motion for CJA fees as Exhibit A) . On May 29, 2013 we suggested an alternative to the expensive and expansive receiver (in the SEC case, DOC 575 not filed until 6/18/13): that the court replace the receiver with the former SEC Monitor Robert Knuts, who oversaw the closing of Amerindo US in a "straight down the middle" way, and asked to be discharged after concluding in November 2005 that Amerindo US was "clean," in that *all* investors had been paid dollar for dollar on their accounts due, and have him watch Gary Tanaka manage out the assets that have now been "de-forfeited" to the government (with no "disgorgement" amounts proven

---

as to which this Court has "sat" on a motion for reconsideration filed last March (in the "civil" case. (DOC 289 6/18/13, 05 cv 5231, and also DOC 575 in the criminal case, 05 cr 621). Judge Sullivan ignored the objections.

[4] The Court allowed third party investors to attend and speak even at the pre-motion conference concerning summary judgment and dismissal motions. Order DOC 225, 4/24/12, 05cv 5231.

and "loss amounts" vacated in the criminal case).

Judge Sullivan did not even consider this reasonable suggestion. There has been no reasoned response to any of defendants' motions or suggestions (except the denial of CJA fees in the civil cases in which Judge Sullivan wrote a lengthy legal opinion (citing cases) that these related cases are not "ancillary" *enough* to the criminal case to require payment of defense fees), motions remain undecided, and the court's finger has been on the trigger in the criminal case.

Gary Tanaka and Alberto Vilar have told the receiver and the court that the information about claims and account holders were provided in the July 2012 submission. It is incomprehensible that on October 25, 2013, the government (now represented by the SEC receiver who adopted the SEC's stance that there must be complete submission here or (unlike SAC) there is no deal) takes the position[5] that the defendants have withheld information when the receiver and the SEC refuse to reveal the backup for the useless summary charts purportedly

---

[5] At Tr. 17 of the October 25, 2013 SEC case hearing, Ian Gazes, reporting on assets he was supposed to find and protect as of over a year ago (assets subjected to SEC and DOJ scrutiny since 2005), accused that defendants were not "revealing" information to him which has caused *him* to "spend time ..." I immediately asked Gazes to specify the "charge" and he lashed out:

MR. GAZES: All the money, all the accounts, where is it all? I've asked you to tell me that. I even asked you to give me the list of investors that your clients are sending letters to and you refuse to do that. You referred me to the government again.

This sounds like Day One 2005, with public statements of "tip of the iceberg" losses by Amerindo US in the mega millions; and like the bail hearing on June 3, 2005, where AUSA Litt said he could not evaluate bail for Alberto Vilar because he had not (yet) found no evidence that Alberto Vilar has offshore funds in the 160 cartons taken from the Amerindo US search (but there must be and we will find it, just wait); and like Litt's 2/3/10 sentencing letter (DOC 418-2), where he could not say what the losses would be because he did (and could not) "know" until some later time when it would all be made clear, at the same time dismissing $50 million in Amerindo Panama assets as "not relevant."

There is obviously nothing defendants can do to convince any Government Entity that information as presented in the July 2012 submission is accurate as to legitimate claims as of the time of the shutdown and that he should check Sharon Levin's information because she reported in February 2012 based on what the government collected in the then-seven-years-pending criminal case (DOC 514). (To the extent she complained about a lack of records which makes reliance on defendants themselves necessary, the records complied with Panama law and account statements are accurate. To the extent the Government Entities *refuse* to rely on defendants and have convinced this Court that they should be disregarded entirely, Judge Sullivan should remember – as Judge Swain would have remembered as she was the judge on the SEC case at the time -- that the SEC Monitor found no flaw with defendants' management of the 98% of their business that was Amerindo US. This track record, rather than past hysterical fears of "more" that they "don't know" (yet) now reincarnated in Ian Gazes, should drive the remedy here. The Court will not hear this; it would upset the criminal case. Disqualification is required.

setting forth "unexaminable" investor claims (and when Neal Jacobson needs another six weeks to support "disgorgement" and "penalties" because he has not worked through the information in Gazes' possession yet). The government will never be satisfied that it made a mistake and that it will never know more because there is no more to know.

There is more than an "appearance" of partiality here. But even if there were no more than an "appearance", 28 USC 455(a), as reaffirmed in the superseding *Ligon* opinion of November 13, 2013, requires this Court to disqualify itself and let chips fall where they may, not where the prosecutor and the SEC place them.

The manner in which this case has been handled has created a financial, personal, and judicial crisis as far as the defendants are concerned. Forced to litigate "related" civil cases without funds for almost ten years now to the drummer of the criminal case judge whose agenda was to get the investors paid out of "substitute assets" never valued and in amounts not set even yet, the defendants have been forced to use lawyers who did not affirmatively challenge these actions because they had to worry about their clients' being sent to jail and penalized yet further. Excepting for the imposed financial hardship, Mr. Tanaka would have preferred to hire a top criminal defense lawyer to assist him when the Court of Appeals remanded for *de novo* resentencing and the SEC continued to step on his rights and try to force him to his knees. Instead, without funds, he was obligated to take Ms. Jane Fisher-Byrialsen , a very delightful young lawyer, the "duty" CJA counsel for the day, who is not experienced enough to handle a high-stakes case in which "jail" is bandied about so easily but where the "main event" continues to be the SEC and "related" actions where the presiding judge remained unaware that there is a stay. Now Ms. Fisher-Byrialsen (as could be expected), uncomfortable with the challenge, has withdrawn, and Mr. Tanaka is faced with the "choice" of taking the next "duty" lawyer without knowledge of the nine-year case still in play,[6] or to represent himself. He has written the Court to say he wants to proceed in the criminal case *pro se* and will execute any waivers required, and has asked me to file this letter for him with this submission. It is attached.

Very truly yours,

/s/ Vivian Shevitz

---

[6] In May 2005, Gary Tanaka was arrested in New York on a criminal complaint signed by AUSA Marc Litt charging that he stole money from his Amerindo clients then bought horses for himself. He has not been allowed to go home since that time. He was not charged by a grand jury with such "crime" and did not commit it. In a proceeding held without notice to Gary Tanaka or Alberto Vilar in the SEC "civil action" Mr. Tanaka was stripped of management rights and kicked out of not only his US advisory firm but also Amerindo Panama, of which the SEC was familiar as it had expressed regulatory "interests" based on the "conduct and effects" test. (Amerindo passed) Detention hearing transcripts show that Litt did not know about their SEC file. It is no wonder Gary Tanaka wants an aggressive lawyer to challenge a prosecutor who might have shuttered SAC Capital on the theory that it is dirty (so admitted), arrested Cohen on the charge that he must have purchased art with stolen client money, and forced litigation by tearing up SAC's Greenwich, Connecticut and London offices to try to uncover the extent of the crimes (thatt he didn't know "yet.") Shouldn't someone question such disparate punishment?



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

86 Chambers Street
New York, New York 10007

July 16, 2012

**BY HAND DELIVERY**
Honorable Richard J. Sullivan
United States District Judge
United States Courthouse
500 Pearl Street, Room 640
New York, NY 10007

      Re:   *In the matter of the Application of Lisa Mayer and Debra Mayer,*
           **12 Civ. 5240 (UA)**

Dear Judge Sullivan:

      This Office represents respondent United States of America (the "Government") in the above-referenced petition, which was removed from the Supreme Court of the State of New York, New York County (Index No. 652201/2012), on July 5, 2012. The petition seeks delivery of property by petitioners Lisa Mayer and Debra Mayer ("Petitioners") to respondents J.P. Morgan Securities LLC, the Government, Amerindo Technology Growth Fund II Inc. and Amerindo Management, Inc., to satisfy judgments obtained by Petitioners against other individuals and entities in a separate state court action. The docket sheet reports that this case has been "referred" to Your Honor's chambers as "possibly related" to another matter. Although the local rules governing assignment of related matters do not apply when one case is civil and the other case criminal, *see* Rule 13(b) of the S.D.N.Y. Rules for the Division of Business Among District Judges, we believe this case's subject matter overlaps with a criminal matter before your Honor captioned *United States v. Vilar*, 05 Cr. 621 (RJS), because the petition contains allegations concerning the Government's rights to property at issue in the petition, pursuant to the criminal convictions of Alberto Vilar and Gary Tanaka, and a forfeiture order entered in that criminal case. *See, e.g.,* Ex. A, Petition for Payment to Judgment Creditors, or Delivery of Property Not in Possession of Judgment Debtors, dated June 25, 2012, at ¶¶ 3, 35.

      In case it may assist the Court, pursuant to Section 2.D of your Honor's Individual Practices, enclosed is a courtesy copy of the Notice of Removal and the accompanying Exhibit A, which was docketed on ECF on July 11, 2012.

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

By:                              
                            TOMOKO ONOZAWA
                            Assistant United States Attorney
                            Telephone: (212) 637-2721
                            Facsimile: (212) 637-2686

Honorable Richard J. Sullivan
July 16, 2012

Enclosure

cc:    By electronic mail, without enclosures
Patrick Begos, Esq.
*Counsel for Petitioners*

Andrea L. Weiss, Esq.
*Counsel for Respondent J.P. Morgan Securities LLC*

Sharon Cohen Levin, Assistant United States Attorney
*Co-counsel for Respondent United States of America*

By Federal Express, without enclosures
David Mainzer, Esq.[1]
Spolin, Cohen, Mainzer & Bosserman LLP
1601 Wilshire Boulevard, Suite 2410
Los Angeles, CA 90025
    On behalf of Amerindo Technology Growth Fund II Inc. and Amerindo Management,
       Inc.

By Express Mail, without enclosures
Gary Tanaka
Fed. Reg. No. 57819-054
FCI Terminal Island
P.O. Box 3007
San Pedro, CA 90731
    On behalf of Amerindo Technology Growth Fund II Inc. and Amerindo Management,
       Inc.

---

[1] The undersigned attorney served the federal Notice of Removal on the parties listed in the attached Affirmation of Service (Exhibit 1) that had been filed in state court by Patrick Begos, Esq., counsel for the petitioners. With respect to respondents Amerindo Technology Growth Fund II, Inc. and Amerindo Management, Inc. ("Amerindo respondents"), the Affirmation of Service listed David Mainzer, Esq. of Spolin, Cohen, Mainzer & Bosserman LLP, as counsel of record for the Amerindo respondents, and Gary Tanaka, as Director of Amerindo Technology Growth Fund II, Inc. and Executive Vice President of Amerindo Management Inc. On July 6, 2012, Mr. Mainzer contacted the undersigned attorney to acknowledge receipt of the federal Notice of Removal, but asserted that he does not represent the Amerindo respondents. When I relayed Mr. Mainzer's message to petitioners' counsel, Mr. Begos replied that Mr. Mainzer is an appropriate representative for the Amerindo respondents because Mr. Mainzer was purportedly designated as the Amerindo respondents' agent for brokerage accounts at J.P. Morgan Securities LLC, which are at issue in this case. I have not heard from Mr. Tanaka, who is currently incarcerated at the Federal Correctional Institution, Terminal Island, in San Pedro, California. Until the identity and contact information of a designated representative for the Amerindo respondents have been confirmed, the Government will continue to serve the Amerindo respondents with Court filings and correspondence by transmitting service copies to Mr. Mainzer and Mr. Tanaka.

Gary A. Tanaka
46 Truesdale Lake Drive
South Salem, New York 10590
16 November 2013

Judge Richard J. Sullivan
United States District Judge
Southern District of New York
40 Centre Street
New York, NY 10007

Re:  United States v Vilar and Tanaka 05 cr 621
Self-Representation

Dear Judge Sullivan:

I write to say that I wish to proceed *pro se* for the remainder of this criminal case.  I do so because it is clear that the provision of a CJA lawyer, appointed solely on a lottery basis—a person selected 'randomly' from the duty roster on any particular day—does not render me effective representation.

This is a very complicated case.  Jane Fisher-Byrialsen is a personable individual but is a relatively inexperienced lawyer who cannot be expected to appreciate or comprehend the interrelationships and intricacies of the "related" "civil" cases in which she found herself immersed on her appointment.

The Court has denied me CJA counsel in the civil cases and has held my funds since 2005.  This has had the effect of compromising my defense by precluding me from hiring a skilled lawyer with expertise commensurate with the <u>real</u> demands of this case.  I could have afforded such counsel prior to the government's wanton destruction of my company and its assets.

I mean no disrespect to anyone appointed to represent me, but I choose to deal with this criminal case without a "regular" CJA lawyer.  I will execute whatever waiver is necessary to represent myself *pro se*.

Sincerely,

*[signature]*

Cc:  Government lawyers and my lawyers. (by email)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 05 cr 621 (RJS) |
| v. | : | DECLARATION AND MEMORANDUM |
| ALBERTO VILAR and GARY TANAKA | : | IN SUPPORT OF |
| | : | RECUSAL OF |
| Defendants. | | JUDGE SULLIVAN |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Vivian Shevitz, under penalty of perjury, hereby declares:

1.  I am CJA counsel to Alberto Vilar and counsel (without pay) for Gary Tanaka in the district court.

2. I make the declaration in support of defendants' motion for recusal of Judge Richard Sullivan on the basis of an appearance of partiality requiring recusal, in accordance with the holding of the Second Circuit in its October 31, 2013 motion decision in *Ligon v. City of New York* and *Floyd v. City of New York*, 13-3123 and 13-2088, *removing* Judge Shira Scheindlin from those cases (*sua sponte*) because of "impropriety and the appearance of impropriety" in an alleged misuse of the Court's `related case rule" and "media interviews" and "public statements" that to the panel

demonstrated actual partiality. The panel concluded that "in the interest, and appearance, of fair and impartial administration of justice" the cases must be assigned at random to a different judge.

3. In this case (pending almost a decade where the forfeiture has just been ordered vacated) Judge Sullivan has *twice* violated the "related case" rule, the same Local Rule cited by the *Ligon* panel.

4. Local Rule 13(b) states (Emphasis added): "(b) **Criminal cases are not treated as related to civil cases or vice versa**."

5. Judge Sullivan first related *SEC v. Amerindo*, 05 cv 5231 (previously before Judge Laura Taylor Swain) to himself (*because* he had the criminal case and there was substantial overlap); then he related *Mayer v. JP Morgan*, 12 cv 5240, to his criminal case (and without ever notifying the defendants in this case.)

6. <u>*SEC v. Amerindo*</u>: By order dated March 19, 2012 in cases *combined* with the criminal case by Judge Sullivan to give Amerindo Panama's clients opportunities to be heard about how "substitute assets" in the criminal case should be distributed (to *them*, non-parties) (DOC 516, 05 CR 621 *and* 05 cv 5231 (now RJS)), Judge Sullivan transferred to himself for all purposes the

"civil" SEC Action "in light of the substantial overlap between these two case". He wrote in that Order that he would resolve the government's then-pending motion for a final order of forfeiture in the criminal case, as well as defendants' motion for a stay of forfeiture pending appeal.[1]

7. Judge Sullivan "took" the "related" SEC case (in March 2012) only after present counsel began to represent Gary Tanaka and made a motion in that case, before Judge Swain, to dismiss on the ground that the "enforcement" proceedings were violative of the defendants' Constitutional rights.

---

[1] On February 9 2012 (DOC 513 criminal case) Judge Sullivan denied appointment of Jane Simkin Smith as CJA co-counsel to help defend "forfeiture" because it was "by no means clear at this time that there will be a need for an additional lawyer in this action going forward." He "noted" that the "forfeiture" litigation "overlaps" with the civil litigation in "a related civil case", citing "the SEC action," writing in footnote 1:

[1] It should be noted that the "forfeiture aspect of the case" overlaps significantly with a related civil case, *Securities and Exchange Commission v. Amerindo Investment Advisors Inc., et al.*, No. 05 Civ. 5231 (LTS) (the "SEC Action"), in which Mr. Vilar is already represented by separate, retained counsel.

He then shifted the litigation over releasing the "substitute assets" to the forced "discussions" in the SEC Action where counsel has had to respond to parties and non-parties without being paid and without being allowed to file motions. The Court allowed for the possibility of a new request for co-counsel "pending the outcome of discussions which may result in a joint resolution of the SEC Action **and the forfeiture aspects** of this case." (DOC 513) (bolded emphasis added). He shifted the litigation to the civil case, refused to release restraints on assets in the criminal case, refused to allow the defendants to manage the assets (*their* Panamanian-held funds), and denied a stay of the forfeiture in the criminal case and denied a stay in the civil case at the same time.

8. The motion for summary judgment was made on March 9, 2012, ten days *before* Judge Sullivan transferred the case to himself (on March 19, 2012 (DOC 516 3/19/13). (In that March 19, 2012 Order Judge Sullivan recognized in a footnote (p. 2 n.1) the pendency of Mr. Tanaka's summary judgment motion and Mr. Vilar's motion to dismiss).

9. The first thing Judge Sullivan did after transferring the SEC case to himself as "related" and "overlapping" was to *deny* the pending motions on the basis of Judge Sullivan's individual rule, which required a "pre-motion letter" prior to making a civil motion. (Order 3/23/12, DOC 221 (""This case was reassigned to my docket on March 20, 2013. ... Rule 2.A of the Court's Individual Practices [requires] a [prior] pre-motion letter setting forth the basis of the contemplated motion. "Accordingly it is HEARBY ORDERED that Defendants' motions are denied without prejudice" and that if they wanted to make the motion they would have to do it again under Judge Sullivan's rules. (Judge Swain had not herself objected on any Individual-rule-preclusion-of-motion ground; the SEC itself (March 14, 2012 letter to Judge Swain) sought to delay

the motion and file an amended amended complaint, not dismiss the motion entirely, as Judge Sullivan did.)

10.     In the same March 21, 2012 Order rejecting defendants' motions to dismiss based on Judge Sullivan's individual rules, Judge Sullivan noted the SEC's letter of March 14, 2012 "reserv[ing] its right to seek leave to amend the amended complaint ..." Judge Sullivan *told* the SEC to "file any motion ... such as a motion to amend or a motion for summary judgment based on collateral estoppel" and cited cases supporting the position that a "criminal conviction ... constitutes estoppel" – for the SEC to use when it filed its invited motion). (See DOC 221 *SEC* Action, denying the motion for summary judgment ("without prejudice," directing defendants to re-file "[s]hould [they] wish to renew their motion." and directing the SEC's attention to cases to support its motion for summary judgment based on collateral estoppel).

11.     Meanwhile, in the criminal case, the government confessed error in its appeal brief as to the forfeiture order. It had to do so in light of the fact that Judge Sullivan ruled on August 26, 2010

(DOC 462) that he had "inadvertently erred" in imposing a forfeiture $36.7 million too high by "enter[ing] the proposed order in substantially the form sought by the government" instead of the amount stated orally at the sentencing hearing. Though the Court "chastised" not only defense counsel (who failed to "note" the discrepancy" but also the prosecutor for failing to comply with the "court's instruction" to file a proposed order that "reflect[ed] the Court's rulings at sentencing" (instead submitting an order that escalated the numbers), and stated in a footnote (DOC 462 ECF p.13 n.5) that he intended to order forfeiture of the "correct" sum of $17,651,159, Judge Sullivan again relied on the same prosecutor's "form" for the substitute asset forfeiture order entered November 9, 2010 (DOCS 463 and 464), and entered a "substitute asset forfeiture" number with the same excessive $36.7 amount of "forfeiture" ordered "inadvertently" previously. The Appellate prosecutor confessed error.

12.     The government did not bring that appellate concession to this Court's attention while the "forfeiture" discussions were being conducted by the "combined" courts then Judge Sullivan himself.

Defendants did so. Then (DOC 518, 4/6/12) Judge Sullivan ruled that, "[i]n light of the government's position that a final order of forfeiture should not be entered at this time" the Court was denying the government's motion for a final order of forfeiture "without prejudice."

13. At the same time Judge Sullivan *denied* defendants' motion in the criminal case to stay the forfeiture of substitute assets and then permitted and facilitated the SEC in confiscating the rights to manage and control those assets. It forced "summary judgment" litigation so that it could appoint a Receiver and denied a stay in that "civil" SEC case; the only way to protect "substitute assets" has been to litigate in this "civil" case.

14. Litigation in this SEC case is, as this Court finally ruled on October 25, 2013 (DOC 613 criminal case), not recompensable for defendants' counsel under the CJA Act because it is "only" about property rights (and in this one court's opinion not sufficiently "ancillary" to the criminal forfeiture case though the Court accepted it for itself as a "related case" to "the forfeiture aspects" (DOC 613, October 25, 2013).

15.     Judge Sullivan has never ruled on *why* he rejected
Defendants' numerous requests in the "related" case that *someone
(the DOJ, the SEC or its  appointed Receiver, or the Court itself)*
direct JP Morgan to credit interest it withheld and to reverse
amounts on portfolio assets designated as" abandoned," or
confiscated while still private securities on Amerindo Panama
accounts; he has never said *why* he has allowed an SEC Receiver
to withhold claims and other documentary information (such as
where the Amerindo Panama assets "collected" by the government
are held, how much, and their current status) -- as if defendants
should have no opportunity to be heard in the *civil* case,
(presumably because they are "fraudsters" as he found in the
"related" criminal case) who deserve punishment above all (and
are *so* dangerous that their rights to "information" should be cut
off as the Receiver and the SEC demand.)

16.     Judge Sullivan has never commented on the showing in the
*civil* case (before the case was "related" to Judge Sullivan) that the
government had destroyed Amerindo US on the ground that there
would be losses in the millions, and that the SEC had installed a

Monitor without defendants' being served with Notice or being

given an opportunity to be heard, and even so the SEC's Monitor

concluded in December 2005 that defendants ran their US

advisory business, Amerindo US (the only entity in which the SEC

has a legitimate interest), "squeaky" clean -- or why a court should

not consider the draconian destruction of their businesses on any

issue, be it the sentence in the criminal case or "equities" in the

SEC case.

17.     *Mayer v. JP Morgan v. the Defendants (and their Clients):*

As a result of restraints (*de facto* from Day One 2005) on all

defendants' assets and the destruction of their main revenue

source at Amerindo US, the Mayers and their lawyer Patrick

Begos obtained a judgment in State court and got a stay of

enforcement lifted *ex parte*.  That case had been stayed pending

the criminal case at the instance of AUSA Litt who personally

interceded by appearance in the State court judge's chambers at

some point, so I understand.

18.     In the criminal case pending sentencing and forfeiture, on

November 23, 2009 this Court Ordered that $150,000 be removed

(from a designated restrained Amerindo Panama account – the

Court itself selected the Techno Raquia account) to give to an

advance redemption payment to a specific client, the Mayers,

adopting the government's position that "Herbert, Lisa and Debra

Mayer (the "Mayer Family") have represented that they have no

means to meet their day to day necessary living and medical

expenses and therefore have requested that certain monies be

released from the Post-conviction restraining order so that they

can be transferred to them to meet those expenses."  (DOC 369).

19.     With this "win" of $150,000 Patrick Begos accelerated the

State court litigation.  After obtaining judgments that create a

windfall,[2] the Mayers, without giving notice to Alberto Vilar or

Gary Tanaka, levied on JP Morgan and named the United States

as holder of the "substitute assets" it wants released.  Sharon

Levin, Chief Asset Forfeiture, of the US Attorney's office removed

the case to this Court and "related" it to the criminal case.  (See

---

[2] Putting aside that the Mayer family flat out avoided filing or paying any taxes for 18 years-and surely for longer before they came to Amerindo Investment Advisors, Inc, this Court ruled that they should get paid by way of "restitution" almost double the amount of their last balance, some $11 million. There State court judgment gave them even more.  This family of tax cheats could get paid more than double the $11 million due on their account..  No one has commented on the stunning denial of Notice (discussed in DOC 618, responding to the Begos' (non-party) letter in the criminal case) occasioned by the Mayers and their stealth litigation tactics.

12cv5241, docket entry 7/5/12 "CASE REFERRED TO Judge

Richard J. Sullivan as possibly related to 1:05-cr-00621.")

20.     This Court accepted the case as "related".  *See* Docket entries

7/18/12 ("CASE  ACCEPTED AS RELATED.  Create association to

1:05-cr-00621-RJS.  Notice of Assignment to follow").

21.     The day before the case was accepted as related Judge

Sullivan signed an order (DOC 5, 7/17/12) extending JP Morgan's

and the Government's time to answer or move.    Defendants had

no notice.

22.      The Court never required or gave notice to defendants in

this criminal case or in that civil case about the acceptance of the

case as related or about the pendency of the case.

23.     Nevertheless it issued rulings (about which we were

unaware) setting deadlines that were **tied** to the court's

appointment of a receiver in the SEC "related" case.

| 07/05/2012 | 1 | NOTICE OF REMOVAL from Supreme Court, County of New York. Case Number: 652201-12. Document filed by United States of America. (Attachments: # 1 Exhibit A part 1, # 2 Exhibit A part 2, # 3 Exhibit A part 3)(lmb) (Entered: 07/11/2012) |
| 07/05/2012 |  | CASE REFERRED TO Judge Richard J. Sullivan as possibly related to 1:05-cr-00621. (lmb) (Entered: 07/11/2012) |
| 07/05/2012 |  | Case Designated ECF. (lmb) (Entered: 07/11/2012) |
| 07/12/2012 | 2 | NOTICE OF APPEARANCE by Andrea Likwornik Weiss on behalf of J.P. |

| | | |
|---|---|---|
| | | Morgan Securities LLC (Weiss, Andrea) (Entered: 07/12/2012) |
| 07/12/2012 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent JPMorgan Chase & Co., Corporate Parent J.P. Morgan Broker-Dealer Holdings Inc. for J.P. Morgan Securities LLC. Document filed by J.P. Morgan Securities LLC.(Weiss, Andrea) (Entered: 07/12/2012) |
| 07/12/2012 | 4 | NOTICE OF APPEARANCE by Adam David Weiss on behalf of J.P. Morgan Securities LLC (Weiss, Adam) (Entered: 07/12/2012) |
| 07/17/2012 | 5 | STIPULATION AND ORDER TO EXTEND RESPONDENTS J.P. MORGAN SECURITIES LLC AND UNITED STATES OF AMERICA'S TIME TO ANSWER: It is hereby stipulated by and between the attorneys for petitioners Lisa Mayer and Debra Mayer, and for respondents J.P. Morgan Securities LLC ("J.P. Morgan") and the United States of America ("the Government"), that the time for J.P. Morgan and the Government to answer, or to make any motion addressed to the Petition for Payment to Judgment Creditors, or Delivery of Property Not In Possession of Judgment Debtors, be and the same hereby is, extended to and including August 10, 2012.SO ORDERED. (Signed by Judge Richard J. Sullivan on 7/17/2012) (ama) (Entered: 07/17/2012) |
| 07/18/2012 | | CASE ACCEPTED AS RELATED. Create association to 1:05-cr-00621-RJS. Notice of Assignment to follow. (pgu) (Entered: 07/18/2012) |
| 07/18/2012 | | CASE ACCEPTED AS RELATED. Create association to 1:05-cr-00621-RJS. Notice of Assignment to follow. (pgu) (Entered: 07/18/2012) |
| 07/18/2012 | 6 | NOTICE OF CASE ASSIGNMENT to Judge Richard J. Sullivan. Judge Unassigned is no longer assigned to the case. (pgu) (Entered: 07/18/2012) |
| 07/18/2012 | | Magistrate Judge Kevin Nathaniel Fox is so designated. (pgu) (Entered: 07/18/2012) |
| 07/26/2012 | 7 | NOTICE OF APPEARANCE by Patrick Walter Begos on behalf of Debra Mayer, Lisa Mayer (Begos, Patrick) (Entered: 07/26/2012) |
| 07/27/2012 | 8 | ORDER: Respondents' time to respond to the Petition is extended until further Order of the Court. Upon receipt of the submissions regarding the appointment of a receiver in the SEC Action, the Court will direct the parties in this action as to how to proceed. (Signed by Judge Richard J. Sullivan on 7/27/2012) (ft) (Entered: 07/27/2012) |
| 11/07/2012 | 9 | SUPPLEMENTAL PETITION FOR PAYMENT TO JUDGMENT CREDITORS, OR DELIVERY OF PROPERTY NOT IN POSSESSION OF JUDGMENT DEBTORS.Document filed by Lisa Mayer, Debra Mayer.(ft) (Entered: 11/13/2012) |
| 11/15/2012 | 10 | ORDER. IT IS HEREBY ORDERED THAT Respondents shall answer Petitioners' Petition and Supplemental Petition for Payment to Judgment Creditors, not in Possession of Judgment Debtors by December 5, 2012. IT IS |

| | | |
|---|---|---|
| | | FURTHER ORDERED THAT Petitioners may submit a reply no later than December 17, 2012. (Replies due by 12/17/2012.) (Signed by Judge Richard J. Sullivan on 11/14/2012) (rjm) (Entered: 11/15/2012) |
| 11/15/2012 | | Set/Reset Deadlines: Gary Tanaka answer due 12/5/2012; Alberto Vilar answer due 12/5/2012. (rjm) (Entered: 11/15/2012) |
| | | |

24.     Defendants were first notified of the government's involvement in this case, and of the pendency of the case, on November 5, 2012, when we were sent a document from Sharon Cohen Levin that she did not object to releasing funds from the restraining order (in the criminal case).  We wrote to the Court on November 14, 2012 but it ignored our letter.  I think that the letter was not filed in any case though I put the caption of all three "related" cases in the "subject".  On November 18, 2012 investor Heitkoenig wrote to the Court also alarmed that he did not know about the Mayer "turnover" action previously.

25.     In the meantime, the Court issued an order in that "turnover" case on 11/15/2012 (DOC 10, 05 cv 5240) – referring to "directions" it had given to "respondents" in that case previously, in July 2012, ("direct[ing] Respondents to refrain from any action until further order from the Court)," and noting that on November 5, 2012 it had received a letter from the government advising that

*it* "has no objection to modifying the restraining order entered in *United States v. Vilar, et al.*, 05 Cr. 621 (RJS) to allow for the turnover of [substitute assets] to Petitioners [the Mayers]".

26.     In the next part of that Order the Court *instructed* the parties how to proceed on an execution of judgment under the CPLR.  Defendants were not notified of this Order.

27.     Since then the Court has ruled (DOC 613) that defendants are not entitled to CJA funds to defend even after they were named as third party defendants by JP Morgan in an interpleader action and even though this Court "related" the case to the criminal case under "forfeiture" and criminal "penalty" jurisdiction:

> In the matter of the Application of Lisa Mayer and Debra Mayer
> Assigned to: Judge Richard J. Sullivan
> Related Cases:   1:05-cr-00621-RJS-1
>                           1:05-cr-00621-RJS-2
> Case in other court:  State Court - Supreme, 652201-12
> Cause: 28:1442 Notice of Removal
>
> Date Filed: 07/05/2012
> Jury Demand: None
> Nature of Suit: 690 Forfeit/Penalty: Other
> Jurisdiction: U.S. Government Defendant

28.     The Court has also refused to release any of defendants' funds, or to make sure the assets are evaluated, or to allow

defendants to manage even the U.K. Pension Fund – remedies we have sought in the civil case where we have reminded the Court that the source of the government's authority over the assets is the vacated substitute asset forfeiture order.

29.     Despite the vacatur of the substitute asset forfeiture order by the Court of Appeals, the Court refused to reconsider Orders directing the SEC receiver (whose job description keeps changing) to move forward spending and taking "substitute assets" and hiring other professionals as he wishes to do what the defendants could do themselves:  get moneys liquidated and paid out to private clients of their Panamanian company.

30.     Defendants filed a mandamus petition in both the criminal case and the SEC case.  The Second Circuit denied mandamus on the ground that the District Court would do its job and there might be remedies at the end of the case, but stayed the distribution of substitute assets in the SEC case.

31.     At the conference in the SEC case on October 25, 2013, this Court (surprisingly for a presiding judge) indicated it was *unaware* that the Court of Appeals had granted a stay of

distribution of substitute assets in the SEC case and assured that it would not do anything until it could. Yet it continues to authorize the taking of the substitute assets to distribute them in the "civil" case.

32.     Besides an appearance of partiality here, we submit there is actual partiality. This Court, the presiding judge over a criminal trial, has allowed "understandings" from the criminal case that have not budged to drive the case. It refuses to (re)consider anything counsel says about facts that have emerged casting doubt on the process and on the appropriate result. It treats the defendants as if the worst of dangerous criminals (who would have warranted an anonymous jury) because they deigned to write a letter to their own investors stating that they are prepared, as had always been so, to return their May 25, 2005 balances.

33.     We learned at the October 25, 2013 SEC case conference that the Court itself reviewed and evaluated the letter Mr. Tanaka and Mr. Vilar wrote to their own clients, intending to possibly cite them for contempt and issue a "gag order" on their talking to their own clients. (The SEC Receiver tried to "order"

defendants to cease communicating with their clients, and to shut down an email address created for communication. I refused).

34.     The Court did not allow comment from the defendants nor posted the letter on the docket to inform the parties (or make a record for the appeals court) as to "information" it is "considering" (bearing on all three cases in which Judge Sullivan presides over defendants' rights) in determining bail and summary judgment motions and in deciding how to dispose of defendants' hard-earned funds and the funds of their Panama clients.

35.     Instead the Court made "findings" on an *ex parte* basis that the defendants were "cute" and intended to "mess with the receiver." (Tr.30).

36.     With due respect the Court has never ruled on our objections that the SEC, its receiver, and the Court, are "messing" with assets that are not forfeited and as to which the government has no rightful claim.

37.     Our motion for reconsideration of the March 11, 2013 Order granting partial summary judgment and of the Order appointing the Receiver, and again seeking a stay of the Receiver's "messing"

with "substitute assets" as to which the government confessed

error on the criminal appeal (filed on March 25, 2013 (DOC 276))

has never been ruled on.

38.     These failure and refusals to rule are indicia of partiality

and conflicting agendas in the civil and criminal cases.  The SDNY

"related case" rule precludes "relation" of criminal cases to any

civil case just to avoid conflicted rulings.

39.     Judge Sullivan violated ethical rules in taking civil cases to

forward the agenda of criminal punishment or impose remedies

consistent with the government's aim to punish more.

40.     This Court should recuse itself under the directive of *Ligon*

*v. City of New York*, *supra* (2d Cir. Motion Order October 31, 2013,

13-3123), citing the Code of Conduct for United States Judges,

Canon 2 ("A judge should avoid impropriety and the appearance of

impropriety in all activities."), and Canon 3(C )(1) ("A judge **shall**

**disqualify himself** or herself in a proceeding in which the judge's

impartiality might reasonably be questioned.")

41.     This case has been going on for almost ten years.  The

government wants to jail these men further, to take away all their

assets and to do so without telling the defendants what the claims are or how they were arrived at, leaving it to an SEC Receiver whom the Court has insulated from challenge.  The Court is allowing this to happen in "related" civil cases where the defendants *cannot* defend properly because they have no funds to do so and Judge Sullivan would not release any or even the right to manage and control the investments, which are dissipating.

42.     Further conduct of this Court dealing with defendants and their assets, and their claims in this regard – not about "just property" but about Due Process and penalties imposed unfairly and for offshore conduct – is a continuing violation of this Court's rules, has prevented fair development of this case on the merits, and requires recusal under the Second Circuit's recent ruling. Judge Sullivan's impartiality "might reasonably be questioned" and the Court should – and per the *Ligon* panel *must* -- recuse itself in this criminal case *and* in the "related" civil cases.

Dated:  November 7, 2013

\_\_\_/s/_____
Vivian Shevitz

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -
UNITED STATES OF AMERICA

                                   05 cr 621 (RJS)
     -against-

                                   DECLARATION IN OPPOSITION
ALBERTO VILAR and GARY TANAKA,          TO GOVERNMENT'S LETTER-
                                   MOTION (DOC 602) TO
       Defendants.                   REVOKE BAIL PENDING
- - - - - - - - - - - - - - - - - - - - - - - - - -   RESENTENCING

        Vivian Shevitz, under penalty of perjury hereby declares:

1.  I am counsel to Alberto Vilar (and appeared previously in the district court for Gary Tanaka,
    for bail purposes, as well).

2.  Seeking to lock both defendants up *now*, the prosecutor argues that this Court should jail the
    defendants based on "findings" that the defendants had contacts abroad and would flee –
    conclusions with which the Court of Appeals disagreed when it granted bail a year ago.

3.  It then discounts Mr. Vilar's (and Mr. Tanaka's) true relationships in New York and argues
    that unknown "international contacts and resources" that the government has supposed for
    years, would "kick in" if they were to remain on bail to entice and support them to flee.

4.  The only (substitute for) "hard evidence" on which the prosecutor relies to support its notion
    of "international" ties and/or personal resources (not "found" "yet" by the prosecutor), is an
    email communication to the Court from John Burke, a nephew of Mr. Vilar, who also wrote
    (in DOC 595, filed by the Court without giving us an opportunity to comment) that *he* (well
    actually, his mother) has a big claim to Amerindo Panama funds because of some perceived
    investment his mother had made with Alberto Vilar before Amerindo began operations
    (valued at an asserted $ 5 million in hypothetical calculations (assuming no payouts) in
    accord with defendants' published performance investment numbers), dismissing hundreds of

thousands in annuity-like disbursements over the years to his mother and to him for their

support) to be paid back to *him,* instead of to his mother, who is not competent, he says.

However, Mrs. Burke retained competency during Alberto's sentencing and in *her*

sentencing letter did not complain of any loss but rather praised her brother Alberto's

generosity (see DOC 596 attaching Patricia Burke's letter which refutes her son's "claim.").

5.  Even the Receiver, who is still unsure whether he knows the universe of Amerindo

   investor/claimants or not, and takes the position that he will not even let my clients see the

   proofs of claim (and will not file the proof of mailing) (we submit to cover up his inability to

   make progress)[1] -- has not included John Burke on the "claims" roster.  (DOC 315, 05 cv

   5231 (RJS).  (Burke has *no* documentation, as he has admitted; he simply has no claim).

---

[1] On October 4, 2013, after filing an unintelligible "claims roster", Ian Gazes wrote to me that he
will not "share" proofs of claim with defendants in this case unless the Court orders him to do so
and will not file his proof of mailing of Notices; and he again asks for *my* "list" as if it will
provide him information he still "does not know."

> **From:** Ian Gazes [mailto:Ian@gazesllc.com]
> **Sent:** Friday, October 04, 2013 6:44 PM
> **To:** 'Vivian Shevitz'
> **Cc:** 'salzbergm@sec.gov'; 'Jacobson, Neal'; 'David C. Burger'; 'Jane Fisher-Byrialsen';
> 'Jane Simkin Smith'
> **Subject:** RE: Back-up for claims... SEC v Vilar and Tanaka 05 cv 5231 (RJS)
>
> Ms. Shevitz:
>
> Unless the court orders otherwise and as stated in the Report the Receiver
> has no intention of sharing the proofs of claim with your clients as demanded.
> Should the defendants wish to examine the proofs of claim at my office and
> agree in writing prior thereto not to take notes and/or copy the papers your
> clients are welcome to do so. Please forward 3 proposed dates and times and
> we will respond.
>
> Request is hereby made again for the list of Amerindo investors including all
> related contact information your clients utilized for the recent letters.

(How are we to avail ourselves of the adversary system of justice if we cannot get copies of the
proofs of claim affecting our property in the first instance?)

Prosecutor Marc Litt had said *he* "did not know" the universe of Amerindo investors in his last-minutes sentencing submission of February 3, 2010 (DOC 418) that no defense counsel responded to (and there was no time to do so: in any event Mr. Litt wanted sentencing based on what he did *not* know).

Sharon Levin said she found out in 2011 that it would be impossible to value all investor claims because she had not appreciated that there were long-term Amerindo Panama investors with no backup. (Business was done on a proverbial handshake in Panama and if left alone, moneys would have been distributed by Amerindo Panama long ago.)

> From: Levin, Sharon (USANYS)
> Sent: Monday, August 01, 2011 4:58 PM
> To: vivian@shevitzlaw.com; 'Jane Simkin Smith'; 'Susan C Wolfe'; Nathan Dershowitz;
> 'Victoria Eiger'; rrl@robinsonbrog.com; Jacobson, Neal; Salzberg, Mark D.
> Cc: Lester, Amy (USANYS); Naftalis, Benjamin (USANYS)
> Subject: RE: Courtesy copy 05-cr-621 (RJS) US v. VILAR
>
> Counsel –
>
> Although I proposed in our phone call that as part of the Petition for Remission process DOJ could distribute to the victims and investors their "initial investment sums, without interest, less amounts already obtained from Amerindo from the investment," it appears that this number will be almost impossible to calculate and if not applied to all victims and investors could lead to an inequitable result. What I did not appreciate is that many of the victims and investors have been investors since the late 1980s and that many of the investors may no longer have any record of their initial investment.

Ms. Levin also wrote in that email chain that her understanding was that a Final Order of Forfeiture was irrelevant because a "win" for defendants on appeal would mean the forfeiture orders would be vacated entirely. She wrote:

> As for your suggestion in your Declaration that a distribution can be made to victims/investors without a Final Order of Forfeiture and that we can use "whatever mechanism was used last time," that is not possible. Leaving aside, the legal issues and the fact that the case is in a very different posture now -- the $150,000 payment was made to the Mayers before the Court entered the substitute asset order -- the Mayers are not the only victims/investors seeking recovery. Practically speaking, who is going to determine what the principal is for each investor, who will review their records and who will make those distributions from the forfeited accounts (write the checks or make the wire transfers)? Unless we have a final order of forfeiture, DOJ and the Marshals Service are unavailable to handle those necessary tasks.
>
> Whether the Court enters the Final Order of Forfeiture does not change the defendants' legal position with respect to the forfeiture. If I understand you, the defendants are appealing the forfeiture money judgment. If the defendants prevail on their appeal, the Final Order of Forfeiture will be

6. This appears to be another instance of the government egging on a "witness" to ramble and rant for their cause (this is Burke's third or fourth unfounded allegation as I wrote in DOC 596, attaching Burke's *mother*'s sentencing letter). Yet, the government writes (as if Burke is a credible witness) that Burke "reports" that "upon gaining freedom" Alberto Vilar "plans to `leave this country for Switzerland to be with his true family." Gov. Letter p.3 of 3, DOC 602 filed 10/4/13, referencing September 25, 2013 email from John Burke to the Court).

7. Just how does Burke "know" this? Did he say? Is it an assumption? He *claims* he questioned Mr. Vilar on the eve of Mr. Vilar's 60th birthday over 13 years ago (but he does not say he was with Alberto (and in fact was told *not* to attend the party)). The man has had an admitted alcohol and drug problem and gives no basis for suggesting he knows anything about Alberto Vilar's present life.

8. How would that happen anyway? The government took Mr. Vilar's ability to travel away. He has no passport, has been granted appointment of CJA counsel, and has been living with a friend whom the government also has condemned in the past for merely supporting Mr. Vilar personally through his hard times. The suggestion that Mr. Vilar would somehow appear in Switzerland, which has an extradition treaty with the US, is incredible. The condition in which the government (DOJ and SEC) has left Mr. Vilar would mean that if he were to "flee" he would have to live the rest of his life a fugitive from the US, with no passport, no funds, and no significant other persons in the region for support. (Perhaps he could get into North Korea or Iran.)

---

vacated along with the other orders of forfeiture entered in this case. I have attached for your information the other forfeiture orders.

Defendants are still being pushed around and punished based on what the government "does not know". We challenge the basis on which the government exercises authority over the "substitute assets" at this time (or ever). We also challenge the government's *right* to know, and to regulate, Amerindo Panama, or its assets.

9. Although the prosecutor may not know it (or did not investigate or think about it before bringing this automatic motion to revoke bail (a letter-motion without serious legal discussion),) Pre-trial Services officers are aware of Mr. Vilar's serious relationship with a woman in Queens, Ms. R., a teacher in the New York city school system who will be retiring after this year and with whom Mr. Vilar began a relationship in the pretrial era (but relationships suffered in those times because of the intensive pressures of the case.) Because I value Ms. R's privacy, and that of Mr. Vilar (and Mr. Tanaka) as well, I leave her name vague in these public papers. The point here is that Mr. Vilar's emotional ties are here, he has a significant person in his life with whom he is planning a future (though his curfew prevents him from staying with her without a court order, which we have not sought for this purpose yet but plan to do (since no one has a serious objection) while waiting for eventual rehearing and *certiorari* decisions) – and he has *nothing* of value (except hopefully some remaining friends) abroad. Mr. Vilar should not be deprived of his liberty on the government's adopted word of John Burke, a man with a personal agenda who has been granted a louder forum in this case than Mr. Vilar or Mr. Tanaka has been given by the government (and the Court) here.

10. Mr. Vilar already traveled with Ms. R. to Florida for a family reunion (with one of Mr. Vilar's bail signers, Karl Gaztambide) *after* the Court of Appeals' August 30, 2013 decision and came back. If the government's fears were anything real this would have been a man who would have fled then. He didn't.

11. Further, though the government does not seem to realize it, defendants *won* the ruling that the forfeiture must be vacated. Assets are *not* forfeited and the government will have to show forfeitability, which I have questioned and at a *de novo* sentencing will continue to question.

With the *surplus* assets after Amerindo Panama investors are paid off on their May 25, 2005 debt, as the defendants intend to do when the government takes its regulatory hand off the Panama corporation (regulated, as shown below, solely under the "conduct and effects" test), as well as interests in their U.K. pension plan, Mr. Vilar and Mr. Tanaka have no intention of being fugitives "unentitled" to litigate further.

12. If nothing else, the Petitions for Rehearing focus this case in a way that should tell the Court (and even government lawyers should take note) that this is no small deal. The Court of Appeals rendered a decision of extreme importance likely headed to the Supreme Court.

13. The government facilely imagines that defendants *should* want to flee, because not only do they face "substantial terms of imprisonment" (certainly if they deem the presence of Amerindo Panama funds "not relevant"), but they face "material monetary penalties, in light of their criminal convictions, and ongoing and potential) civil litigation with the SEC, defrauded investors, and others."

14. Pointing to the SEC as a "civil" case "unrelated" to this one, where it is "OK" to hold defendants' assets pursuant to an invalid forfeiture and force litigation because it's "always done this way" (even after destroying the "clean" U.S. advisory company that successfully completed an SEC audit conducted from 2003 through 2005 and did nothing wrong -- exacting the penalty before the case began) is something that the Constitution does not allow. As soon as defendants are given an opportunity to say *anything* in the SEC case, we will complain (again).

15. We will also challenge the validity of the SEC case entirely, based on documents that came from the SEC's files (either not turned over to the prosecutor before he effectuated the arrests and shutdown on May 25, 2005 (since he said at the June 3, 2005 post-arrest, post-search bail

hearing that he was awaiting the results of the SEC's examination to get records of the San Francisco-advisory operation) or ignored, which we discovered in files not appreciated and also ignored but which should have been turned over. *See United States v. Mahaffey*, (2d Cir. August 2, 2012) (Appellate court finds misconduct by SEC and U.S. Prosecutors in "Squawk Box Case," http://wallstreetonparade.com/2012/08/appellate-court-finds-misconduct-by-sec-and-u-s-prosecutors-in-squawk-box-case-overturns-convictions/)

16. In 1993 the SEC expressly stated that it was demanding records of what it called the "affiliated advisory firm registered in Panama (`Amerindo Panama')" and that it was doing so under the "conduct and effects" test -- stating that "generally, the Act is applied to regulate activity taking place outside the United States where that activity produces substantial and foreseeable **effects in the United States or involves conduct occurring in the United States.**" *See* Letter, January 21, 1993, to Alberto Vilar for Amerindo Investment Advisors', Inc. in San Francisco." (emphasis added to highlight the beginning of the "conduct and effects" `test'" regulation asserted all these years). I append a portion of that letter and ask that the government get the SEC's copy from its File No. 801-24922 as well. In fact Amerindo Panama was a completely separate corporate entity from the US company (and predated the US company, as did Amerindo UK). The SEC has purposefully confused and "integrated" the separate Amerindo entities in its regulatory fanaticism to hold foreign companies to US standards: but the "conduct and effects" test under which the SEC operated (see image below) is dead, and never was the right standard.

AMERINDO INVEST      ID:3038458138          JAN 26'95   20:39 No.004 P.07

Alberto W. Vilar, President
Page 6

    Absent evidence to the contrary, Registrant is in violation
of Rule 206(4)-2(a)(4).  Registrant should immediately begin to
provide the limited partners with quarterly statements as
required by the Rule.

V.   Failure to Provide Requested Documents

    During the examination of Registrant, the examiners
requested the trading records for client accounts of off-shore
investment advisory firms that are owned and managed by you and
Mr. Tanaka.  While Registrant provided the staff with the trading
records of the affiliated advisory firm registered in the UK
("Amerindo UK"), Registrant declined to provide the staff with
the trading records of the affiliated advisory firm registered in
Panama ("Amerindo Panama").

    The Commission's Division of Investment Management has taken
the position that, generally, the Act is applied to regulate
activity taking place outside the United States where that
activity produces substantial and foreseeable effects in the
United States or involves conduct occurring in the United
States.¹  Abusive practices such as front running and
unauthorized principal and agency cross transactions involving
the accounts of foreign clients or foreign affiliates could harm
United States investors.  For example, an adviser might sell a
security from a foreign client's account to the account of a
United States client without receiving written authorization from
the United States client in contravention of Section 206(3) of
the Act, which addresses such agency cross-transactions, or place
foreign client transactions ahead of a large transaction by a
United States client.  The Act should be applied to such
activities because they involve United States clients.

    Currently, Rule 204-2 of the Act requires, among other
things, that registered advisers maintain records of not only
their trades, but also of trades by any controlling persons or
affiliates thereof who obtain information about investment
advice.

    The San Francisco office requested guidance from staff in
the Division's Washington office.  The Washington staff has
advised us that the operations of off-shore investment affiliates
must be separate from the operations of the registered domestic
investment adviser, particularly with regard to the persons
providing advisory services, before there is a rational basis for

    ¹   SEC Division of Investment Management, Protecting

17. *Morrison* now makes plain (and we are not in a "plain error" context given pending motions

for reconsideration of summary judgment) that the SEC's motions for summary judgment are

ill-founded, and that the prosecution was ill- founded too.  Defendants' conduct, indeed, falls

within the express exception to the Securities Act (section 30) mentioned by the *Morrison*

Court in its decision, because they conducted an offshore securities business and it was not

for the purpose of evading U.S. regulations.  As *Morrison* pointed out, there were no such

regulations.  (Only a conduct-and-effects inquiry self-promoted by the SEC, supposedly

"justify" the imposition by the SEC and its "remedies" here on parties to offshore financial

transactions, *none* of the parties to which wanted the SEC's intrusion; in fact the only way

the SEC gained "authority" by the SEC Court to do what it has done here, was by *not*

notifying Mr. Tanaka or Mr. Vilar of the TRO proceeding on June 1 2005 and to proceed without their knowledge and without their being represented to disenfranchise them).

18. In any event, the Petitions for Rehearing and Rehearing *en banc* show serious and substantial issues likely to result in reversal (or which should result in a *reduced* term of incarceration because the pending rehearing proceedings gives everyone an opportunity to think about the sentence as it was based on accusations leveled for the first time a day before sentencing (Letter 2/3/10, DOC 418) complete with uncharged offenses committed against speculated unnamed investors (Litt said he had not pursued these charges because of insufficient evidence) who would no doubt be "found" when the government completed forfeiture notices. Mr. Gazes is still looking for them; and *real* investors, known to all, have refused, or declined, or don't want to play the US regulators' game of submitting claims in yet another forum on offshore accounts already acknowledged to be due.

19. There is no reason to anticipate that these men should go to jail again when, as we will show under 18 USC 3553 if nowhere else—there were no losses. The government's theory was flawed. It prosecuted these men for Panamanian conduct but deemed the Panama funds "not relevant" and not only did this Court, but also the Court of Appeals, has so far declined to consider any facts other than those initially selected, crafted and put before the Court by prosecutor Litt.

20. The Court should not prejudge a *de novo* resentencing.

21. The Government's application to revoke bail should be denied.

Dated: South Salem, New York
        October 18, 2013                    _/s/_____
                                            Vivian Shevitz